Milton LUROS, Appellant,
v.
UNITED STATES of America,
Appellee.

SUN ERA, INC., Appellant,
v.
UNITED STATES of America,
Appellee.

AMERICAN ART AGENCY, INC.,
Appellant,
v.
UNITED STATES of America,
Appellee.

PARLIAMENT NEWS, INC., Appellant,
v.
UNITED STATES of America,
Appellee.

LONDON PRESS, INC., Appellant,
v.
UNITED STATES of America,
Appellee.

Nos. 18707–18711.

United States Court of Appeals
Eighth Circuit.

Feb. 7, 1968.

Stanley Fleishman, Hollywood, Cal., for appellant; Sam Rosenwein, Studio City, Cal., and Percy Foreman, Houston, Tex., on the brief.

Gene S. Anderson, Atty., Criminal Div., Dept. of Justice, Washington, D. C., and former United States Atty. Donald E. O'Brien for the Northern District of Iowa, for appellee; Stephen M. Turner, U. S. Atty., Sioux City, Iowa, and Theodore Kleinman, Atty., Criminal Div., Dept. of Justice, Washington, D. C., were on the brief.

Before VOGEL, Chief Judge, and GIBSON and LAY, Circuit Judges.

LAY, Circuit Judge.

The recurring problem of obscenity vel non is presented. The appeal arises from a criminal prosecution under 18 U.S.C. §§ 1461 and 1462, as amended (1964), for mailing and transporting "obscene" literature. Appellants are four corporations and their sole stockholder, Milton Luros. A jury trial was held in the Northern District of Iowa, Western Division, under the venue provision applicable to the above statutes, 18 U.S.C. § 3237 (1964).[1] After a finding of guilty the trial court sentenced appellants Luros, Parliament News, Inc. and London Press, Inc. on eighteen counts; Sun Era, Inc. on eleven counts; and American Art Agency on six counts.

Appellants posit their appeal upon three basic contentions: (1) that the books and magazines involved were not proven "obscene" and therefore protected under the First Amendment; (2) that the court erred in its instruction concerning the kind of scienter or knowledge required to sustain a conviction; and (3) that the venue statute permitting the government to pick the forum for prosecution in Iowa renders the conviction unconstitutional under the First, Fifth and Sixth Amendments of the United States Constitution.[2]

In view of our decision that the material is protected under the First Amendment, we need not discuss the latter two issues.

"Obscene" literature is not within the protection of the First Amendment. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). However, concern over self-censorship and encroachment upon the protected areas of the First Amendment brought forth these words of caution:

"The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress

1. Originally the action was against appellants and an additional eleven co-defendants under a twenty-five count indictment. The trial commenced on October 18, 1965. At the close of all the evidence (the defense having offered no oral testimony), the court dismissed seven of the counts. The jury returned a verdict of guilty against all the defendants on January 14, 1966. On November 4, 1966, the trial court sustained a motion for judgments of acquittal with respect to all defendants with the exception of the appellants Luros and the four corporations. United States v. Luros, 260 F. Supp. 697 (N.D.Iowa, 1966). For prior rulings on change of venue, etc., see United States v. Luros, 243 F.Supp. 160 (N.D.Iowa 1965).

2. During the course of present litigation appellants brought suit with others in the District Court of the District of Columbia challenging the venue statute as applied to obscenity prosecutions; the decision was handed down by a three-judge court on October 26, 1967, upholding the constitutionality of the statute.. See Reed Enterprises v. Clark, Civil Nos. 1744-65, 2562-65, 3009-65 consolidated (D.D.C., October 26, 1967).

or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests. It is therefore vital that the standards for judging obscenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest." Id. at 488, 77 S.Ct. at 1311.

Subsequent interpretations of *Roth* have clearly demonstrated the Court's own "vigilance" as to these principles. Although definition of "obscenity" is not without difficulty,[3] we submit that sufficient standards now exist which compel reversal of the present convictions.

In Redrup v. State of New York, 386 U.S. 767, 770, 87 S.Ct. 1414, 1416, 18 L.Ed.2d 515 (1967), a per curiam opinion summarized the Court's views:

"Two members of the Court have consistently adhered to the view that a State is utterly without power to suppress, control or punish the distribution of any writings or pictures upon the ground of their 'obscenity.' A third has held to the opinion that a State's power in this area is narrowly limited to a distinct and clearly identifiable class of material. *Others have subscribed to a not dissimilar standard,* holding that *a State* may not constitutionally inhibit the distribution of literary material as obscene unless '(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value,' emphasizing that the 'three elements must coalesce,' and that no such material can 'be proscribed unless it is found to be *utterly* without redeeming social value.' Memoirs [A Book Named "John Cleland's Memoirs of a Woman of Pleasure"] v. [Attorney General of Com. of] Massachusetts, 383 U.S. 413, 418–419 [86 S.Ct. 975, 977–978, 16 L.Ed.2d 1]. Another Justice has not viewed the 'social value' element as an independent factor in the judgment of obscenity." (Emphasis ours.)[4]

*Redrup* points up three other areas where prosecution might succeed: (1) where the statute relates to a limited *state* concern for juveniles,[5] (2) where there is an obtrusive "assault" by pornography upon an unwilling individual and (3) where "pandering" exists as found in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966).

In the present case, convictions rest upon two distinct groups of material mailed or transported by appellants:[6] (1) nudist magazines and (2) paper-

---

3. "In toto, applying the law to specific questioned materials has been a labor as frustratingly impossible as is nailing custard pies to trees." Kuh, Foolish Figleaves? Pornography in-and-out of-Court 215 (1967).

4. In *Redrup*, Justices Harlan and Clark dissented on procedural grounds. Mr. Justice Harlan's dissenting opinion in *Roth*, 354 U.S. at 503, 77 S.Ct. 1304, 1 L.Ed.2d 1498, indicates he feels the problem of obscenity should be one primarily entrusted to the states and not to the federal government. He has consistently maintained this position, voting to affirm state convictions, and to dismiss federal prosecutions under 18 U.S.C. § 1461. See note 15, infra, p. 206.

5. See Separate Obscenity Standard for Youth, 1 Ga.L.Rev. 707 (1967).

6. The trial court dismissed all of the counts relating to a third class of magazines consisting of pictures of scantily clad and nude models, generally posed in suggestive and provocative positions (called "girly" magazines). Although described as "sexually provocative," these are generally not within the proscription of the statute. Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962); Redrup v. State of New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967).

backed "pocket book" publications dealing with fictional lesbian and heterosexual exploits.

I. ▆ It is clearly established that "nudist" magazines are not obscene per se. Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352 (1958); Mounce v. United States, 355 U.S. 180, 78 S.Ct. 267, 2 L.Ed.2d 187 (1957); Rosenbloom v. Virginia, 388 U.S. 450, 87 S.Ct. 2095, 18 L.Ed.2d 1312 (1967); cf. United States v. Central Magazines Sales, Ltd., 381 F.2d 821 (4 Cir. 1967). The government acknowledges this, but contends the defendants are guilty under a "pandering" or conduct theory.[7]

The government's argument can be summarized as follows: that appellant Luros and his corporations publish nudist magazines simply to make money; that many of the nudist models, although signing complete "releases" for the photographs, nevertheless did not contemplate national publication; that paid professional models, who were not nudists, posed for the magazines; that the magazines falsely represent that the models are nudists; that the magazines picture "staged" scenes *outside* nudist camps depicting activities such as cooking, boating, hiking, etc., which nudists do not normally do in the nude; that appellant Luros continually sought legal advice as to whether his magazines were "defensible"; that appellant Luros instructed his editors that they could now use photographs showing the male genitalia in the foreground; that appellant Luros bought a nudist camp for the sole purpose of taking pictures; that their own editors described the magazines as "crap plus one" and that "zetz"

was required to make them sell. In summary, the government urges appellants' sale of the nudist material is nothing more than "commercial exploitation" on the basis of prurient appeal.

We deem such evidence relevant to the issue of conduct since *Ginzburg* speaks of publications being "created" as well as "exploited" on a prurient basis. 383 U.S. at 474, 86 S.Ct. 942. However, there is no claim that these magazines were advertised or exploited as "erotica" as in *Ginzburg*.[8] The contention is that whatever social value the nudist magazines may have becomes lost in the background of the production and sale by appellants premised solely upon their prurient appeal. See A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, 383 U.S. 413, 420, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

▆ The basic fallacy of this argument, in the context of the nudist publications involved, is the false premise that "commercial exploitation of nudism" is equated with prurience. The different pictures taken and published show both men and women, as well as children, in various poses and activities. We would agree that young female models or subjects dominate most pictures. Yet there is no magazine in evidence where men and women are shown embracing or in any alleged provocative or suggestive pose that smacks of a prurient appeal.

▆ There is no question but that appellant and his corporations make a profit in the business of selling nudist magazines.[9] Yet there is nothing within the creation or production of the magazine itself that can be said to focus on the pru-

7. The government, even prior to the release of the Ginzberg case, supra, told the jury in their opening statement that the defendants were being tried for their *conduct* in the publications involved. Chief Justice Warren had first forewarned of this basis of proof in his concurring opinion in Roth v. United States, 354 U.S. at 494, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

8. "In substance, did the publisher (or distributor, or dealer) print an evocative

cover, advertise prior banning, display the item massed with other borderline items, and urge in various ways erotic, deviant, or scatological appeal?" Kuh, op. cit. at 78.

9. This in and of itself is not a proper consideration. See Ginzburg v. United States, 383 U.S. at 474, 86 S.Ct. 942, 16 L.Ed.2d 31.

rient unless it can be said that *the production* of the nude picture depicting male or female pubic hair and genitalia qualifies by itself.[10] Clearly, where such pictures are innocuous in their setting, even though they may be offensive to many, and even if some viewers' sexual curiousity or appetite may be whetted, the law does not consider them "obscene." As stated in Roth v. United States, 354 U.S. at 487, 77 S.Ct. at 1310: "Sex and obscenity are not synonymous. Obscene material * * * deals with sex in a manner appealing to prurient. interest." And the Court relates:

"We perceive no significant difference between the meaning of obscenity developed in the case law and the definition of the A.L.I., Model Penal Code, § 207.10(2) (Tent. Draft No. 6, 1957), viz.:

" ' * * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters * * * ' " Id. at 487, n. 20, 77 S.Ct. at 1310.

■ Nudism is considered in good taste by only the relatively few. The verdict in the present case acknowledges that portrayal of it "goes substantially beyond customary limits of candor" in even today's modern and tolerant community.

Nevertheless, it cannot be legally condemned as a *morbid* or *shameful* representation of sex itself. This we conclude is the basis of the reversal of Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352 (1958), relying upon *Roth*.[11]

■ No conduct of appellants was offered, which could be evaluated on its face, as demonstration of a prurient appeal superadded in the production or sale of the magazines. Of all the conduct charged, we fail to see a scintilla of proof that Luros or anyone else under his control gave directions or edited pictures with resultant publication to represent sex in a lustful, morbid or shameful way. Appellants' convictions on these counts must be reversed.

II. This brings us to the so-called lesbian books. We would agree that these books constitute undoubted trash and have little if any literary value or social importance. They are written, as one author testified, with one purpose in mind—to sell! They produce high profit for appellants and can be described as distasteful, cheap and tawdry. Yet these facts alone do not constitute a crime.

■ A state judge in California dismissed an earlier criminal action[12] against the same appellants and involving some of the same books and others with the same alleged theme, since the books

---

10. As to this, there has been disagreement by other courts in the past. Cf. State v. Vollmar, 389 S.W.2d 20, 28–29 (Mo. Sup.Ct.1965), but see discussion in United States v. 25,000 Magazines, Entitled "Revue", 254 F.Supp. 1014 (D.Md.1966), where Chief Judge Thomsen finds the nude pose innocuous in itself, but "obscene" when in "suggestive" situations (only the government appealed—see per curiam affirmance in United States v. Central Magazine Sales, Ltd., 381 F.2d 821 (4 Cir. 1967); see also Parmelee v. United States, 72 App.D.C. 203, 113 F.2d 729 (1940). But even where the totally nude female is in an alleged sexually provocative pose, the magazine itself has been declared not obscene. See Central Magazine Sales, Ltd. v. United States, 389 U.S. 59, 88 S.Ct. 235, 19 L.Ed.2d 49

(U.S. Oct. 23, 1967), reversing 373 F.2d 633 (4 Cir. 1967).

11. *Roth* relates to a discussion of the prurient effect of the material judge as a whole, on the average community. Standards relating to "social importance" (see Jacobellis v. State of Ohio, 378 U.S. 184, 191, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964)), and "patent offensiveness" (see Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962)) were developed and articulated later. For discussion of the developing federal standards, see generally Paul & Schwartz, Federal Censorship—Obscenity in the Mail (1961); see also Note, 75 Yale L.J. 1364 (1966).

12. People v. Luros, No. 295183 (Super.Ct. Calif., filed June 21, 1965).

were "not utterly devoid of social value."[13] Appellants urge that the frank and sordid discussion of sexual perversion is itself the social importance to be weighed. Other lower courts have realistically declared such arguments to be facades for their true purpose. See, e. g., Landau v. Fording, supra, 245 Cal. App.2d 820, 54 Cal.Rptr. 177. But whether the claimed modicum of social value exists, or whether the books themselves lack the requisite "prurient appeal," or whether independently they are not patently offensive, under present legal standards and precedents which this court must follow, the books cannot be declared obscene pro se. See A Quantity of Copies of Books v. Kansas, 388 U.S. 452, 87 S.Ct. 2104, 18 L.Ed.2d 1314 (1967); Books, Inc. v. United States, 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311 (1967); Aday v. United States, 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed.2d 1307 (1967).

Nor did the government offer any competent evidence outside of the books themselves to demonstrate their pruriency. See United States v. Klaw, 350 F.2d 155 (2 Cir. 1965). Again the government urges that the conviction be sustained under proof of appellants' conduct. But we again find no evidence to sustain a criminal conviction under the concept of "pandering" where the books are of the kind which otherwise have been declared not to be obscene themselves. Under such circumstances, there must exist independent evidence of prurient appeal *and* patent offensiveness, in the production or sale and distribution. There is no claim of a prurient appeal in the advertising circulars mailed. However, the government relies upon Mishkin v. State of New York, 383 U.S. 502, 505, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966), where the defendant gave his authors specific instructions as to research, format and content in order to give the stories prurient appeal for sexual deviates.

■ The evidence does substantiate appellants' key role of approval and actual editing of the manuscripts submitted. But this alone is not actionable. United States v. Klaw, 350 F.2d 155 (2 Cir. 1965); Aday v. United States, 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed.2d 1309 (1967), reversing United States v. West Coast News Co., 357 F.2d 855 (6 Cir. 1966); Books, Inc. v. United States, 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311 (1967), reversing 358 F.2d 935 (1 Cir. 1966). Here the only other competent evidence comparable to *Mishkin* relates to Luros's editing the covers, and at one time telling his editor that "nurse and lesbian work * * * seems to be selling and doing well." Since the written portrayal of lesbianism is not obscene itself, we fail to see that an implied direction to sell this type of literature can suddenly transform the material so as to make it actionable. The mere act of selling the literature otherwise could be condemned and easily prosecuted.

In Redrup v. State of New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967), there is specific indication that a majority of the Supreme Court adopts standards "not dissimilar" to banning only "hard-core" pornography.[14] Subse-

---

13. E. g., the court discussed the book, The Three-Way Apartment, which is one of the books named in the instant case, as follows:

"This book also deals predominantly with the subject of sex. * * *

"The mere suggesting of 'wife swapping' is offensive to me. However, I cannot say that the book has passed the limits proscribed in Section 311(a). My personal offense is not the test. There is a possible 'moral' to the story, perhaps even a psychological lesson that may be of value to marriage counselors. Considering all the marital problems and sexual frustrations I have observed as an attorney and as a judge, it is possible that this book might be of an aid to marriage counselors. I cannot say the book is *utterly* (absolutely) without redeeming social importance." Id. at 9.

14. Justice Stewart, dissenting in Ginzburg v. United States, adopted a description of hard-core pornography as follows:

" * * * Such materials include photographs, both still and motion picture, with no pretense of artistic value, graphically depicting acts of sexual in-

quent application of *Redrup* gives no contraindication.[15]

■ In the general sense, all of the material published by appellants fall within the purveyor's own graphic classification of "crap plus one," or in other words just plain trash. Our decision is not intended to indicate any approbation of the "esteemed literary works" herein involved. Our task cannot in any way relate to the individual tastes or philosophies of the members of the court. We simply find that the evidence of "pandering" is insufficient under the present facts of the case, and under the controlling law, the judgments must be vacated.

■ Many well-intentioned citizens become disgusted or offended with the freedom by which purveyors of trash place their publications in the mail.[16] But within the juridical balance is the basic concern over governmental interference into free channels of expression. It is far better there be a tight rein on authoritarian suppression, notwithstanding a conflict with some individuals' tastes or customary limits of candor, than that we live in a stifled community of self-censorship where men must feel apprehension over expression of an unpopular idea or theme. Still within our human possession is the free will to make an independent choice of values and to teach our children to do the same. Paternalistic censorship by government must continue to limit that choice only in the most extreme of circumstances. Thus we view the general reluctance of the law to go further in this area.

Judgment reversed and the cause remanded to the District Court with direction to enter judgment of acquittal for each appellant on all counts of the indictment.

---

tercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character. They also include strips of drawings in comic-book format grossly depicting similar activities in an exaggerated fashion. There are, in addition, pamphlets and booklets, sometimes with photographic illustrations, verbally describing such activities in a bizarre manner with no attempt whatsoever to afford portrayals of character or situation and with no pretense to literary value. All of this material * * * cannot conceivably be characterized as embodying communication of ideas or artistic values inviolate under the First Amendment. * * *" 383 U.S. 463, 499 n. 3, 86 S.Ct. 942, 957, 16 L.Ed.2d 31.
Compare Levin v. State of Maryland, 1 Md.App. 139, 228 A.2d 487 (holding: "First Amendment does not bar conviction under Maryland obscenity statute of bookseller who sold uncaptioned pictures of nude males each 'distinguished by a large penis in full erection.'") cert. den. 389 U.S. 1048, 88 S.Ct. 767, 19 L.Ed.2d 840, 36 U.S.L.W. 3280 (U.S. Jan. 16, 1968).

15. Mr. Justice Brennan indicated in Mishkin v. State of New York that while New York bans only "hard-core" pornography, federal standards under *Roth* are less stringent. 383 U.S. 502, 508, 86 S.Ct. 958 (1966). However, we observe that the Court has sustained only one "obscenity" finding since *Mishkin:* Landau v. Fording, 388 U.S. 456, 87 S.Ct. 2109, 18 L.Ed.2d 1317 (1967). This was a silent film made with professional actors dealing with homosexual conduct in a prison. See Landau v. Fording, 245 Cal. App.2d 820, 54 Cal.Rptr. 177 (Dist.Ct. App.1966). The California court relied upon Ginzburg v. United States, but also held the film "obscene" under Justice Brennan's tripartite test. On appeal there was a per curiam affirmance by the Supreme Court, with four Justices dissenting (Black, Douglas, Stewart, and Fortas). We can only surmise that the result would have been different if the case had involved a federal prosecution. See, e. g., Mr. Justice Harlan's dissent in Avansino v. New York, 388 U.S. 446, 87 S.Ct. 2093, 18 L.Ed.2d 1308 (1967) and his concurrence in Books, Inc. v. United States, 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311 (1967). See note 4, supra.

16. Hearings on H.R. 426 Before the Subcom. on Postal Operations of the House Committee on Post Office and Civil Service 90 Cong.1st Sess., ser. 90–20, pt. II (1967).