# HEWITT t/a BALTIMORE FILM SOCIETY
# *v.* MARYLAND STATE BOARD
# OF CENSORS

[No. 278, September Term, 1968.]

*Decided June 6, 1969.*

The cause was argued before BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Richard C. Whiteford* for appellant.

*George W. Liebmann, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Lewis A. Noonberg, Assistant Attorney General,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

This appeal is from an order of the Circuit Court of

Baltimore City (O'Donnell, J.), passed August 2, 1968, in which the film "Odd Tastes" was disapproved for licensing as being in violation of the provisions of Code (1957), Art. 66A, § 6 (b) as found by the appellee, Maryland State Board of Censors (the Board). The Board, finding the film to be obscene, petitioned the Circuit Court for a determination of its obscenity in accordance with the applicable provisions of the Maryland law. The appellant, William E. Hewitt, trading as Baltimore Film Society, submitted the film to the Board for approval and licensing, was a party to the proceedings before the Board and the Circuit Court and took a timely appeal to this Court from the order of August 2, 1968. We have viewed the film as required by Art. 66A, § 19 (a).

At the trial in the lower court, the Board called three expert witnesses: Dr. Robert M. Vidaver, on the issues of appeal to prurient interest and contravention of contemporary community standards; Professor William R. Mueller of Goucher College and Reuben Kramer, a prominent sculptor of national reputation, the testimony of the two last mentioned witnesses being limited to the issue of redeeming social value. The appellant, Hewitt, called two witnesses in the lower court: Dr. Sol Gordon, a clinical psychologist, and Albert D. Gerber, a Philadelphia attorney and legal advisor to makers of "sexploitation" films. We will now consider the test to be applied, the qualifications and testimony of these witnesses.

There were three issues of mixed law and fact involved before the Board and the lower court arising from our previous decisions applying the constitutional requirements imposed by decisions of the Supreme Court of the United States in regard to freedom of speech. In *Dunn v. Maryland State Board of Censors*, 240 Md. 249, 255, 213 A. 2d 751, 754 (1965), Judge (now Chief Judge) Hammond, for the Court, aptly stated:

> "We think it plain that save in the rare case where there could be no doubt that the film is obscene the Board will not meet the burden of

persuasion imposed on it by the Constitution and the statute without offering testimony that the picture is obscene in that (a) the average person, applying community standards, would find that its dominant theme, taken as a whole, appeals to prurient interest, (b) that the film goes substantially beyond customary limits of candor in description or representation of sex or other matters dealt with, and (c) that it is subject to proscription because it is utterly without redeeming social importance considered in light of the fact that '* * * sex and obscenity are not synonymous', *Roth,* 354 U. S. 476, 487, 1 L. Ed. 2d 1498, 1508, and the fact that material dealing with sex in a manner that advocates ideas or has literary, scientific or artistic value or any other form of social importance may not be branded as obscenity."

Our definition of obscenity—the *Roth-Alberts* test — was restated with somewhat different emphasis perhaps, by the Supreme Court in *A Book Named "John Clelands' Memoirs of A Woman of Pleasure" v. Attorney General,* 383 U. S. 413, 418, 86 S. Ct. 975, 977, 16 L.Ed.2d 1, 5-6 (1966), hereinafter referred to as *Memoirs,* in which Mr. Justice Brennan, for the Supreme Court, stated:

"We defined obscenity in *Roth* in the following terms: '[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 U.S. at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters;

and (c) the material is utterly without redeeming social value."

We recognized and applied this latest statement of the applicable rule in *Sanza v. Maryland State Board of Censors,* 245 Md. 319, 326-27, 226 A. 2d 317, 320-21 (1967), in which we sustained the Circuit Court and the Board in their finding that certain films, shown in an arcade in "the Block" in Baltimore, were obscene. Dr. Vidaver (because of a misprint, referred to as Dr. *B*idaver in *Sanza*) testified before the Circuit Court as an expert in *Sanza* and his testimony was relied upon by the Chancellor in that case and by us on appeal.

The appellant conceded at the argument of the case before us that there was sufficient evidence before the Chancellor from Dr. Vidaver's testimony from which he could find that the dominant theme of the film "Odd Tastes" taken as a whole, appeals to the prurient interest. He earnestly argued in both his brief and at the oral argument that Dr. Vidaver's testimony was not sufficient to sustain the Board's burden of proof to establish that the film was patently offensive because it affronted contemporary community standards relating to the description or representation of sexual matters. At the threshold of the appellant's argument on this issue is the contention that Dr. Vidaver is not qualified as an expert witness to express an opinion having any probative value on the issue. We do not agree with this contention.

Dr. Vidaver's qualifications as an expert witness are impressive and, as we have already indicated, both the Chancellor and this Court relied upon his expert testimony on this issue—as well as other issues—in *Sanza*. In *Sanza,* Judge Oppenheimer, for the Court, summarized Dr. Vidaver's qualifications as follows:

"Dr. Robert M. Vidaver is Director of Psychiatric Education for the State of Maryland, Department of Mental Hygiene. Born in Minneapolis, Minnesota, he lived in the midwest during the early part of his life. He was graduated from

Columbia University and studied medicine at the City University of New York, interned at the University of Maryland and the University Hospital, had three years' post-graduate training at the Yale Institute and has been on the faculties of the Johns Hopkins Hospital and the University of Maryland. He was Chief of the Psychiatric Section of Medical Service, United States Army." (245 Md. at 328, 226 A. 2d at 321)

In addition to these qualifications, Dr. Vidaver testified in the lower court in the present case in reply to a question in regard to his training in audio-visual techniques for use in treating mental-health problems:

"Well, what we were trying to do was set up a closed-circuit video-tape television system at the University of Maryland Psychiatric Institute as a means of training medical students in a variety of professional skills and psychiatric diagnosis. Included in my work was a — were trips throughout the country to hospitals, universities, and psychiatric synods that already had some use of either film or video tape in training or in treatment, and these ranged from the University of Mississippi Psychiatric Institute through those of the East and West Coast, and required me to learn something of the techniques of audio-visual communication."

The film contains a series of episodes of various types of sexual perversion. It is well summarized by Dr. Vidaver in his testimony as follows:

"(The Court) What is its relationship to sadism, as you saw it?

"(Mr. Whiteford) I object to the Court's question.

"(The Court) Overruled, because the Court saw the gory details of the knife being plunged

in Madam Clary's bosom, and saw the unhappy scene which, I suppose, for want of a better word we would characterize this as being a tragedy, in the Greek definition, or distinction between comedy and tragedy, as the central figure fell on his own knife. What is its relationship to sadism and, of course, I am referring, also, to the blowtorch applied to the reinforcing bars to which the young Negress' hands were strapped. What is its relationship to sadism?

"(The Witness) A very strong one I believe, sir. Sadism we usually talk of as being different from merely violence or aggression, in that it has sexual overtones, or is a combining of the sexual and aggressive drives. So, when we speak of a sadistic assault, meaning a sexual encroachment of the body of another, was especially used by the producers and directors of this film to heighten the sexual excitement, to emphasize the sexual theme, to sell, to pander, as it were, the sexual qualities of the film to an American audience already somewhat dulled to ordinary sexuality; to make it more appealing and stimulating—.

\* \* \*

"I do feel that the appeal was very cleverly used to stimulate not so much the normal sexual drive of heterosexual relations and sexual intercourse, but a variety of perverted and infantile sexual themes.

"It starts out, of course, with the appeal to the kind of incestual fantasies of mother and boy child, with Ruthie opening her breasts to the infant Charles, and then, if imagination hasn't caught on already, going through a routine with her mouth and lips that is highly suggestive of fellatio to the infant.

"From there, of course, there is the kind of brother-sister incestual stimulation of Melaine

and the growing Charles. Both of these had, at least, been man-woman, and have led us into this kind of heterosexual perspective. When he moved to the boarding school—

" (The Court) He said his father found out about it and sent him away to Switzerland, as I recall.

" (The Witness) So you have, there, the theme of punishment for the sexual fantasy which, again, is stirring to the audience.

"In the boarding school, Thomas' sister seemingly enters—

" (The Court) Seemingly, I think, is a good word. Thomas' sister quote—I think that should be in quotes.

" (The Witness) Yes, sir—since we have already seen two women in a state of relative nakedness, we are quite caught up in the expectation as viewers that this would be another woman, when suddenly she unmasks and turns out to be a boy.

"There is the sexual confrontation of both homosexuality and the fantasies of women with a penis that is, again, a kind of problem area often for adolescents and small children who are still struggling to firm up sexual identification.

"Following this, it causes the homosexual relationship between Thomas and Charles, and it is suggested, if not the actual portrayal, of fellatio and the delight thereof.

"From there on, we have repeated castration themes with the implication that if you play with sex or play with yourself, you will end up much the same as the hero—literally castrated and bleeding his life away.

"These are not only sexual themes to my perspective, but have primitive and unhealthy pathological sexual themes. Far from bringing

out any catharsis in a normal sense or a ventilation of sexual drives, it presses, pushes, stimulates the most unhealthy of sexual feelings which might be present in all of us, and most of us try our best to repress and keep in control.

"So what we are left with is the kind of stimulation in sexual areas that we have no way to discharge."

In regard to whether or not the film was patently offensive as exceeding contemporary community standards, Dr. Vidaver testified that it exceeded contemporary community standards with respect to candor in motion picture films "to display it for entertainment purposes." He further stated:

"If this was a medical documentary whose audience was to be professional persons, social workers, psychiatrists, doctors, then the purpose of the film might be to display the sexual aberrations possible in society, either educational or informational. But, since they were not even accurate in their portrayal of Oriental or African culture, we don't see an educational or informational purpose, here, but an entertainment one. And the entertaining value, as I see it in the film, comes through its ability to stimulate sexual energies in the individual.

\* \* \*

"I found it to be patently offensive if I had paid money to see it in the theater in the expectation of humorous satire, tragedy, what-have-you— biography—and had thrust upon me this kind of assault at unconscious feelings or drives—homosexual, regressive, perverted—under the guise of watching a panorama of human behavior, I would feel upset and disturbed, and I would find this patently objectionable."

In contrasting the treatment of sexual matters in the film, "Odd Tastes" with other films, including a film in

which "sexual activities were displayed" but which had been licensed by the State Board of Censors, Dr. Vidaver testified:

> "The crucial difference, though, is that it represented a natural development of the characterization and plot. We had real, live people — teenagers — portrayed; their families, their work, their school, their sport activities, their leisure, and as part of their human existence, there was the expression of sexual needs. For good or bad, morality aside, it was in the portrayal of real human beings or the attempt at it, in everyday life, that was followed through in that aspect which was sexual.
>
> "This is diametrically different from 'Odd Tastes,' where we see virtually nothing about the people except their sexual proclivities. We know really nothing about any of the women or Thomas or Charles as a person—his thoughts, feelings, hates, loves, skills, failures, foibles—we don't know them as human beings. All we know them as is as something of sexual animals. You can tell anything about the size, shape, and configuration of their buttocks, and nothing about the rest of their human existence. And this kind of an exaggeration and misshapen portrayal of the sexual drive is what gives to this picture, 'Odd Tastes,' a dominant theme which is prurient—not just the portrayal of nakedness, nudity, or sexuality."

It is clear to us from Dr. Vidaver's testimony that his opinion was that the film, "Odd Tastes," exceeded the limits of the community's toleration for what is shown in motion pictures, not merely that the sexual activities shown in the film would not be tolerated in the community.

Dr. Vidaver's testimony in this regard is, in our opinion, stronger in support of his opinion on this issue than

was his testimony on the same point which we found legally sufficient in *Sanza.* We said in *Sanza*:

> *"Nor do we agree with the appellants' contention that there is no evidence that national standards have been affronted. While most of Dr. Vidaver's testimony went to the effect of the material on the prurient interest of the average man, he also testified that, while the gyrations shown on the films might be acceptable between husband and wife, 'the performance for anybody else would be beyond the bounds of propriety.'* Unlike the situation as to the films 'A Stranger Knocks' (*Trans-Lux*) and 'Lorna' (*Dunn*) there was no showing by the appellants that the films had been exhibited elsewhere in the country; indeed, the appellant Sanza admitted that, as far as he knew, they had not been shown except in Baltimore. Finally, with the gloss of Dr. Vidaver's uncontradicted testimony, the pictures speak for themselves." (Emphasis supplied) (245 Md. at 333-34, 226 A. 2d at 325)

Mr. Gerber, a witness for the appellant, acknowledged that the film, "Odd Tastes" was more explicit in two respects than certain other films to which Mr. Gerber referred. In reply to the question, "* * * Is it your testimony that you * * * see no distinction in the explicitness of the film, 'This Film is Censored' (which we held to be constitutionally protected in *Hewitt v. Maryland State Board of Censors,* 243 Md. 574, 221 A. 2d 894 (1966)) and 'Odd Tastes'?" Mr. Gerber replied:

> "I have already expressed one point where it differed, if that is—and I don't believe—personally, I think it is a distinction without a difference, and that is, in 'This Picture is Censored,' it did not show pubic hair. And I would add one other comment, to be fair and complete,

in that I have no personal interest in these subjects—and that is, in 'Odd Tastes,' there is also a scene where the male touches—fingers the female breast, which is again something that is comparatively new in the making of these films. This has been the kind of thing that has been coming, but just arriving. They started out by having the male finger the thing, then the buttocks, other parts of the body, and only recently in a few pictures the breasts."

In regard to whether or not the film, "Odd Tastes" was utterly without redeeming social importance, Dr. Vidaver testified:

"I could find no redeeming social value or educational or informational aspect. One might compare it with a recent film from Massachusetts called 'Tillicott Follies,' which is actually under injunction in Massachusetts, and has been released by a subsidiary of the Grove Press, well-known for their anti-censorship endeavors. 'Tillicott Follies' shows a great deal of nakedness and brutality in one of the Massachusetts State Hospitals, and in itself is a terribly upsetting and disquieting film. But when Judge Bazelon brought it to the Hopkins, he was bringing with him a film with a social message calling for, literally, a revolution in our mental hospitals which was portrayed so vividly in the nakedness and beatings and abandonment of these people in the State Hospitals in Massachusetts.

"We see none of this, for example, in 'Odd Tastes.' There is every suggestion that drinking, dope, sex, murder is okay, just don't fall down on the knife and don't get caught.

"(The Court) Well, the police didn't even come on either murders, did they — or either homicides, I should say?

"(The Witness) Yes, sir, that would have

taken time away from the next sexual theme, I guess."

The testimony of the other expert witnesses for the Board in regard to the issue last mentioned was accurately summarized by the Chancellor in his opinion as follows:

"Mr. Reuben Kramer, a sculptor, and a graduate of the Maryland Institute, who had studied eleven years in this country and abroad art, drawing and sculpture, could find no artistic value in the film and although concededly not an expert in cinematography found no redeeming artistic value in the color film.

"Dr. William R. Mueller, a graduate of Princeton University, who received his doctorate in literature at Harvard, and at present is a professor of English at Goucher College, who has been on the faculty of a number of colleges and who is an author as well as teacher, having published two books on the 'Theater of the Absurd: Testament of Samuel Beckett' as well as 'Ionesco and Genet: Playwrights of Silence,' found that there was no literary merit in the film 'ODD TASTES' that, indeed, it had 'no real theme' that it was a recount of the 'protagonist in search of maximum pleasure—a combination of sex and pain' and was merely a sequence of events with a common protagonist. He found that there was no characterization in the theme, that it was particularly 'humorless and unwitty' from the point of words of the script; he contrasted it with the films, 'A Man and a Woman' and 'The Graduate' and found, in his judgment, that the exclusive purpose of the film was to stimulate sexual desires."

The Chancellor also summarized the testimony of the experts who testified for the appellant, Dr. Sol Gordon,

an associate professor of psychology and education at Yeshiva University and Albert D. Gerber, Esquire, a member of the Bar of Philadelphia and a writer who has specialized in the "field of pornography as affected by law," but concluded that he would accept the testimony of Dr. Vidaver and of Dr. Mueller, stating in his opinion:

> "The Court concurs in and gives great weight to the testimony of Dr. Vidaver as well as that of Dr. Mueller; indeed, the testimony of Dr. Mueller seems to be uncontradicted or rebutted.
>
> \* \* \*
>
> "The Court from the weight of the expert evidence is satisfied that to the average persons, applying contemporary community standards — regardless of whether such standards are the standards of a national community of interests, or of the community of Maryland—the dominant theme of the material, taken as a whole, appeals to the prurient interest.
>
> "The Court finds, in connection with this conclusion, that the dominant theme of the film, taken as a whole, appeal to a prurient interest in sex, that the material portrayed in the film is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters and that the material in the film is utterly without redeeming social value and that these three elements coalesce and that the Petitioner, Maryland State Board of Censors, has sustained the burden of proof imposed upon it in finding that the film is obscene in a constitutional sense and is in violation of Art. 66A, § 6b."

Our viewing of the film, "Odd Tastes," itself, confirms the findings of the Chancellor in his well-considered and helpful opinion in this case. In our opinion the Chancellor correctly applied the applicable law to the facts found by him and we shall affirm the order of August 2, 1968.

In addition to the facts already set forth, in regard to pandering, there was evidence in the case which indicates to us that the principles announced by the Supreme Court in *Ginzburg v. United States*, 383 U. S. 463, 86 S. Ct. 942, 16 L. Ed. 2d 31 (1966), and considered by us in *Sanza* are applicable in the present case.

The appellant, Hewitt, testified:

"Q. Mr. Hewitt, at which theaters of Baltimore would the film—the motion picture, 'Odd Tastes,' be shown if it were approved? A. The Rex and Lord Baltimore.

\* \* \*

"(The Court) Excuse me—let me ask this—do these two theaters, the Rex and Lord Baltimore, specialize in showing what your counsel has classified as 'Sex-ploitation' films?

"(The Witness) Yes, sir.

"(The Court) And that is all that they show?

"(The Witness) Yes, sir."

Dr. Gordon, one of the expert witnesses for the appellant, left little doubt in regard to the titling and character of the film, "Odd Tastes." He testified:

"Q. You can have it in your subconscious and drive a car and it won't come up from your subconscious? A. I think that some people have learned to cash in on what they discover to be a way that people need vicarious thrills and pleasures, and they are cashing in on that. I, myself, feel that—again, I know—I feel very strongly that if we had really good sex education, there would be virtually no interest in pornography. And I also feel very strong—

"Q. We are getting off on the philosophy. A. Sorry—all right.

"Q. I am faced with 'Odd Tastes.' A. Yes — my view is—

"Q. Do you think that the title, itself, 'Odd Tastes,' suggests this— A. Sure.

"Q. —as part of the money-raising scheme? A. Certainly.

"Q. They could have called it a travelogue, I suppose, with stops in the various nations. A. Yes, but that wouldn't bring in the money.

"Q. Wouldn't draw any customers? A. Certainly."

This evidence showing the "circumstances of presentation and dissemination"—to use the language of Mr. Justice Brennan in *Ginzburg, supra* (383 U. S. at 470, 86 S. Ct. at 947, 16 L. Ed. 2d at 38), has a direct bearing on the issues presented by the Roth-Alberts test as it may show an appeal to the prurient interest as well as the lack of any redeeming social value, inasmuch as where "the purveyor's sole emphasis is on the sexually provocative aspects" a court could accept his evaluation and such factors "may be decisive in the determination of obscenity." (*Ginzburg, supra*, 383 U. S. at 470, 86 S. Ct. at 947, 16 L. Ed. 2d at 38) As Judge Oppenheimer, for the Court, stated in *Sanza*:

"We do not deem it necessary to decide whether the methods of advertising the showing of the films in the arcade and the location of the booths within the area of 'the Block' constitute 'pandering' under the *Ginzburg* doctrine. However, in determining whether the films are obscene we do consider, *inter alia*, the method in which the films are shown—the viewing in a booth by a single spectator, in the position of a peeping Tom, who feeds his coins into the machine presumably in the hope that he will be even more titillated by what will come than by what has gone before. We believe that the manner of the particular presentation is relevant to a consideration of whether the film is an appeal to prurient interest, not only under *Ginzburg*, but under the *Roth-Alberts* test before *Ginzburg*

was decided." (245 Md. at 334, 226 A. 2d at 325)

The appellant earnestly argued that the *Roth-Alberts* test is no longer a viable one in view of the decision of the Supreme Court in *Redrup v. New York,* 386 U. S. 767, 87 S. Ct. 1414, 18 L. Ed. 2d 515 (1967), and several cases in the United States Court of Appeals for the Eighth and Ninth Circuits, District Courts and a State court interpreting the decision in *Redrup.* These cases are *Luros v. United States,* 389 F. 2d 200, 205 (8th Cir. 1968) ; *Culbertson v. California,* 385 F. 2d 209, 210 (9th Cir. 1967) ; *United States v. 4400 Copies of Magazines,* 276 F. Supp. 902 (D. Md. 1967) ; and *State v. J. L. Marshall News Co.,* 13 Ohio Misc. 60, 232 N. E. 2d 430 (1967), which appear to equate the holding in *Redrup* as permitting the State, except in the case of laws dealing specifically with juveniles, to proscribe material only if it is hard core pornography or if there has been "pandering" as set out in *Ginzburg, supra.* But see, *contra, United States v. Four Books,* 289 F. Supp. 972 (C. D. Cal. 1968), in which the *Roth-Alberts—Memoirs* test was applied ; *In re Giannini,* 72 Cal. Rep. 655, 662, 446 P. 2d 535, 542 (1968) ; and *Landau v. Fording,* 245 Cal. App. 2d 820, 54 Cal. Rep. 177, *aff'd mem.,* 388 U. S. 456, 87 S. Ct. 2109, 18 L. Ed. 2d 1317 (1967), this affirmance by the Supreme Court taking place after its decision in *Redrup.* See also Krislov, *From Ginzburg to Ginsberg,* 1968 Supreme Court Review, 153, 191-92. More importantly, the Supreme Court, itself, has recently indicated in *Stanley v. Georgia,* 394 U. S. 557, 89 S. Ct. 1243, 22 L. Ed. 2d 542, that *Roth* and the following cases — including *Ginzburg*—are still presently the applicable test. In *Stanley,* the Supreme Court in an opinion written for the majority by Mr. Justice Marshall, in which Black, J. concurred and Stewart, Brennan and White, JJ. concurred in the result (this later concurrence being on the point that the search and seizure in the case was invalid and the film was improperly admitted into evidence against the accused in any event) held that a Georgia statute

prohibiting possession of an obscene film by a private citizen in his own home was void under the provisions of the First and Fourteenth Amendments to the Constitution of the United States. Mr. Justice Marshall, however, stated, for the Supreme Court:

> "*Roth* and the cases following that decision are not impaired by today's holding. As we have said, the States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his own home. (394 U. S. at 568, 89 S. Ct. at 1249-50, 22 L. Ed. at 551)

Assuming, *arguendo*, as contended by the appellant, that *Redrup* did require a finding that the State statute, not dealing specifically with juveniles, could only proscribe material which is hard core pornography (which we do not believe is the case), nevertheless in the present case we are of the opinion that the film, "Odd Tastes," is indeed hard core pornography and, as such, could be proscribed by the Maryland statute on this theory also.

In our opinion, the most apt definition of "hard core pornography" we have seen is that given by Judge Fuld of the Court of Appeals of New York in *People v. Richmond County News, Inc.*, 9 N. Y. 2d 578, 216 N. Y. S. 2d 369, 175 N. E. 2d 681 (1961), cited with approval by the Court of Special Appeals in *Levin v. State*, 1 Md. App. 139, 145, 228 A. 2d 487, 489 (1967), *cert. denied*, 389 U. S. 1048, 88 S. Ct. 767, 19 L. Ed. 2d 840 (1968):

> "It [hard core pornography] focuses predominantly upon what is sexually morbid, grossly perverse and bizarre, without any artistic or scientific purpose or justification. Recognizable 'by the insult it offers, invariably, to sex, and to the human spirit' * * *, it is to be differentiated from the bawdy and the ribald. Depicting dirt for dirt's sake, the obscene is the vile, rather than the coarse, the blow to sense, not

merely to sensibility. It smacks, at times, of fantasy and unreality, of sexual perversion and sickness and represents, * * * 'a debauchery of the sexual faculty'." (9 N. Y. 2d at 587, 216 N. Y. S. 2d at 376, 175 N. E. 2d at 686)

It is clear to us that the film, "Odd Tastes," confined as it is largely to depicting sado-masochism, fits well within this definition.

In any event, it is clear to us that *Redrup* continues the principles enunciated in *Ginzburg* in regard to pandering and, as we have indicated, the evidence in the present case makes those principles applicable.

*Order affirmed, the costs to*
*be paid by the appellant.*