HEWITT t/a Baltimore Film Society *v.* MARYLAND STATE BOARD OF CENSORS

[No. 118, September Term, 1969.]

*Decided January 7, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SMITH and DIGGES, JJ.

*Robert M. Wright* for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We here approach one of our less pleasant tasks under our present law, namely, the review of a motion picture film which we have been obliged to view and which even its greatest champions will hardly call entertaining.

Appellant, William E. Hewitt, trading as Baltimore Film Society (Hewitt), submitted to the Maryland State

Board of Censors (the Board) the film entitled "Love Camp 7" for licensing pursuant to the provisions of Code (1967 Repl. Vol.), Art. 66A, § 6. The Board disapproved the film. In conformity with the provisions of § 19 a timely petition was filed for judicial review. The Circuit Court of Baltimore City (Joseph Carter, J.) viewed the film, heard the expert witnesses and rendered an opinion sustaining the action of the Board in disapproving the film for licensing. We shall sustain the action of Judge Carter.

Under the decisions of this Court (e.g. *Wagonheim v. Md. St. Bd. of Censors,* 255 Md. 297, 258 A. 2d 240 (1969) ; *Hewitt v. Md. St. Bd. of Censors,* 254 Md. 179, 182, 254 A. 2d 203 (1969) ; and *Sanza v. Md. Board of Censors,* 245 Md. 319, 326-327, 226 A. 2d 317 (1967)) and the decisions of the Supreme Court of the United States in *Roth v. United States,* 354 U. S. 476 (1957) ; *Jacobellis v. Ohio,* 378 U. S. 184 (1964) ; and *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General,* 383 U. S. 413 (1966), the test to be applied is that as stated by Mr. Justice Brennan in *Memoirs, supra*:

> "We defined obscenity in *Roth* in the following terms: '[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 U. S., at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." *Id.* at 418.

The State called four expert witnesses, Dr. William R.

Mueller, Professor of English at Goucher College; Dr. Paul Yaffe, a clinical psychologist; Mr. Jaromir Stephany, head of the Department of Photography and Films at the Maryland Institute; and Reuben Kramer, a local sculptor of renown. Dr. Mueller and Mr. Kramer were witnesses in *Hewitt v. Md. St. Bd. of Censors, supra.*

Dr. Mueller was qualified as an expert as to literary merit and community standards. He testified in part:

"Q. Now, bearing in mind the proposition that sex and nudity—obscenity and nudity— are not synonymous, bearing in mind also that obscenity and violence are not synonymous, but that certain sadistic activities can partake of sexual perverted character, did you find the depiction of sexual matters in this film to be patently offensive by contemporary community standards, as you understand them? A. I think this is a very difficult question to answer. I would preface what I am going to say by saying I have never been more offended by a film.

"Q. I am not asking that. A. I know you are not, but I have to say this in preface to make it clear. I can't give a yes or no, and it is a far more complex matter than that. I certainly would have to agree with Judge Carter that there was not in this film the degree of sexual activity that there has been in many of the other films which I have seen at the Censor Board. It did seem to me — it does seem to me that within the film there was a going beyond the violence which offended me in particular. That is, one can be violent without the sexual aspects. There was a depiction of violence through the cruelty of the officers and the guards and a violence which was directed to sexual matters. That is to say, the humiliation so frequently was a humiliation of a woman's body. Now I don't mean in terms of sexual intercourse necessarily, but the business

of the torture of the pointed table into the vagina, for example, or the fact that it wasn't enough to lift the buckets, but this had to be done in the nude, or the fact that when the girl was hanging there it was necessary for the guard to take his whip and pull back her blouse. It seemed to me a combination here of the violence and of the sexual. It was the violence which offended me more than the seeing on the screen of the nude bodies or even of, let's say, the final rather orgiastic party of the officer which came just prior to the attack on the camp. Now I realize I have not given you a really direct answer, but, as I say, I have tried to come as close to my response to the film as possible. It does seem to me that the film is offensive. I can't see how the film cannot be offensive to anybody's taste.

\* \* \*

"If I were to analyze this from a literary point of view, I would say the sole intention of the film was to exploit the subject of sadism and in this case the subject of sadism as it is related to sex.

\* \* \*

"I have never seen a film in which there was [as much] candor displayed in the relationship between sexual matters and violence.

\* \* \*

"Q. (Mr. Liebmann) I am now asking a conclusory question, which relates not to your judgment as to the offensiveness of this film, but to your understanding, as an objective fact of contemporary community standards in the nation— as to the candor displayed in the depiction of sexual matters, including sexual perversions — and I am asking you whether, judged by your understanding of contemporary national standards, this film is patently offensive? A. I think

that it is, judged by what I would assume to be the national or local standards, yes.

"Q. And did you find any merit — I have asked you about characterization. Did you find any merit in the film as a dramatic production in terms of its plot, in terms of its total dramatic effect? A. No. I found nothing distinctive about it."

As to literary merit, Dr. Mueller said, "The characters seem to me static characters." With regard to literary merit in works of art which deal with violence against the female body, Dr. Mueller contrasted this film with the play of Jean Genet, "The Balcony", a work in which there is character development and a relationship among the various parts which gives Genet's work a unity and wholeness absent from the film in question. Dr. Mueller was not testifying that Genet's work was simply better than this, but used "The Balcony" as an example of a work dealing with a similar subject matter in which the artist handled it with artistic success.

Dr. Yaffe was presented as an expert in the field of prurient interest. The record with reference to his testimony is in part:

"Q. Did you find that the dominant theme of the film, taken as a whole, appealed to the prurient interest, by which I mean an attempt to produce sexual arousal or sexual reactions of one sort or another on the part of the audience? A. If I had to limit myself to an answer of yes or no, I would say yes.

"Q. But you don't have to limit yourself. A. As I viewed the film, I saw two themes emerging. One was an ostensible theme that this was a factually based film, a documentary, the purpose being to depict the operations of the intelligence of the British forces in their efforts to retrieve certain very essential materials. However, it served only as a kind of framework for

displaying acts of cruelty and sadism connected with sex, in a relatively irrelevant manner. I had the feeling that I was attending a side show where the barker was saying, in effect, 'I have here some terrible things to show you; they are horrible, beyond comprehension; they will revolt you; they are terribly upsetting, but I want you to see them.', and recognizing that by his speech he was not turning the people away but inducing them to come in and share in prurient satisfaction.

"Q. Now, did you find the episodes of violence in the film—I speak specifically of the episodes of violence directed against the women—to have sexual connotations? A. Unquestionably. The beatings were not beatings, they were sexual activity thinly disguised. One had only to recognize or examine the faces of the ones who were administering the beatings to recognize they were getting a great deal of pleasure from this, and because of the knowledge that we have psychologically of these kinds of activities, we recognize that these are sexual ways of satisfying sexual urges of a perverse character.

\* \* \*

"A. Yes. In this case, the administrators of the beating were deriving sexual pleasure.

"Q. (Mr. Liebmann) In other words, you are saying sadism is a recognized sexual perversion? A. Correct.

\* \* \*

"(The Court) \* \* \* [Y]ou got in the faces of these monsters what you interpret to be sexual gratification? A. Yes."

Dr. Yaffe was clear in his opinion that the dominant theme of the film was an appeal to the prurient interest of those attracted to sexual violence. The record continues:

"Q. What percentage of the film, taken as a whole, in terms of time, was devoted to the portrayal of sexual activity or sexual violence or the prelude to them? A. No less than seventy-five per cent. * * *

 * * *

"Q. (Mr. Wright) Was there an attempt to make the scenes of sexual violence ancillary to the story line of the movie? A. I should say it was the reverse.

"Q. I thought you said on your direct examination that there was an attempt, but, in your opinion, it was fraudulent. A. Yes. I said that, and I meant to indicate that ostensibly this was a story about the intelligence of the British army attempting to gain some valuable information. That was the ostensible attempt, but, very clearly, the intent in the actual unraveling of the story was to portray girls being subjected by depraved men to perverted acts of sex."

He further stated that he found sexual appeal of a deviant nature which seemed to be employing a symbolic means to portray perverted oral sexual gratification and in scenes implying homosexual attraction. He concluded that the dominant theme of the film as a whole was an effort to arouse the audience.

Mr. Stephany was qualified as an authority on the issue of redeeming artistic merit and on the issue of contemporary community standards, local and national. He could not find literary merit as a documentary, nor as a fictionalized treatment of a historical event. He contrasted two films dealing, at least in part, with a similar subject matter, "Night in the Fog", a documentary, and "Hiroshima mon Amour", in which historical events were fictionalized, with the treatment in this film. Particularly in "Night in the Fog" the treatment of brutality and torture had been handled in a manner deserving of the appellation "art". Stephany also stated that the depiction

of sexual violence or sexual brutality exceeded the national community standards.

Mr. Kramer was qualified as an expert on the issue of artistic and literary value. His testimony in part was:

"Q. (Mr. Liebmann) Let me ask you with respect to the film 'Love Camp 7' what your conclusion was with respect to the artistic merit of this film viewed as a total entity. A. I found the film in itself, of which I am not an authority —I found the photography, I would say, was pretty good. It might even be excellent. It was good, the color looked good to me. The story perhaps could have been an interesting story, but I found that the content, the beatings, the violence, the torture, the degrading of the human being, was intolerable. Well, let me put it this way. The handling of the art part of it wasn't sufficient to carry the indignities which I have just mentioned.

"Q. Well, let me ask you whether, viewing the work as a whole, you found it possessed any artistic merit? A. No. If there were any, it was totally lost in the permanent impression of such goings on.

\* \* \*

"Q. Did you find any purpose in this film other than the depiction of sexual violence? A. No. It must have been eighty-five per cent. It would have left very little except the first few minutes and the last few minutes. It got right to work. There could have been a little more—the girls flying in the plane. The other thing I found very, very disturbing, if they were going to use these girls for that purpose why did they make them so wretched. I should imagine a German officer from the Wehrmacht after a day in the field if he would be presented with somebody would certainly be presented with a good-looking girl,

> well-dressed and all the comforts, rather than a wretch who had been beaten half to death with a rag tied around her. I would think he would find her pretty much objectionable because of her condition in which she was presented to him."

He alluded to works of art, "Guernica" by Picasso and "The Torture of Saint Sebastian" by Michelangelo, in which violence and brutality are depicted artfully, but could find no art in the manner of depiction in this film. With regard to its dramatic merit, Kramer testified: "There is nothing dramatic about it. It is just a torture chamber." Further, even as a depiction of torture or sexual brutality, Mr. Kramer could find no artistic merit. Kramer pointed out that stark realism can be artistic, but need not be; that is to say, "Realism has nothing to do with whether it could be artistic or not."

The chancellor rested his decision on *Mishkin v. New York,* 383 U. S. 502 (1966), stating:

> "In my opinion, the real issue in this case is whether or not a film is obscene if it appeals to the prurient interest of certain groups rather than to the normal or average person; if the latter, the State's case might well fail, but if the former, I must reach a different conclusion."

He then held the answer to be in *Mishkin v. New York, supra,* where Mr. Justice Brennan said for the Court:

> "[A]ppellant's sole contention regarding the nature of the material is that some of the books involved in this prosecution, those depicting various deviant sexual practices, such as flagellation, fetishism, and lesbianism, do not satisfy the prurient-appeal requirement because they do not appeal to a prurient interest of the 'average person' in sex, that 'instead of stimulating the erotic, they disgust and sicken.' We reject this

argument as being founded on an unrealistic interpretation of the prurient-appeal requirement.

"Where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement of the *Roth* test is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group. The reference to the 'average' or 'normal' person in *Roth*, 354 U. S., at 489-490, does not foreclose this holding. In regard to the prurient-appeal requirement, the concept of the 'average' or 'normal' person was employed in *Roth* to serve the essentially negative purpose of expressing our rejection of that aspect of the *Hicklin* test, *Regina v. Hicklin*, [1868] L.R. 3 Q.B. 360, that made the impact on the most susceptible person determinative. We adjust the prurient-appeal requirement to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests of its intended and probable recipient group; and since our holding requires that the recipient group be defined with more specificity than in terms of sexually immature persons, it also avoids the inadequacy of the most-susceptible-person facet of the *Hicklin* test.

"No substantial claim is made that the books depicting sexually deviant practices are devoid of prurient appeal to sexually deviant groups. * * * Not only was there proof of the books' prurient appeal, compare *United States v. Klaw*, 350 F. 2d 155 (C.A.2d Cir. 1965), but the proof was compelling * * *." *Id*. at 508-10.

Hewitt concedes that *Mishkin* authorizes a suppression of material lacking a prurient appeal to the community as a whole, but attempts to distinguish that case because

it deals with written material. He states that written material is displayed upon the news stands and the passerby who has an interest in the deviant sexual practices illustrated in the printed material has the opportunity to peruse and select that which is titillating to him which is not the case with a motion picture film. He overlooks, however, the factor of word-of-mouth advertising which inevitably takes place with any such material.

In this case Hewitt presented no evidence. We are conscious of our obligation to make our own independent evaluation of the film. In the light of the Supreme Court's holding in *Mishkin* relative to appeal to deviant groups, we have no difficulty on this record and upon viewing this film in concluding that the elements enumerated in *Memoirs* (*i.e.* (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value) do in fact coalesce. Therefore, the judgment of the Circuit Court of Baltimore City should be affirmed.

The Board has brought to our attention that the cost of the showing of the film to this Court was $25.00 which it asks be included in the costs. It should be.

*Decree affirmed; costs to be
paid by the appellant.*