VILLAGE BOOKS, INC. ᴇᴛ ᴀʟ. *v.* STATE'S
ATTORNEY FOR PRINCE
GEORGE'S COUNTY

[No. 37, September Term, 1971.]

*Decided October 13, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Stanley M. Dietz* for appellants.

*John P. Stafford, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Jayson Amster, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

This trek into the malodorous marshes of obscenity will be somewhat less frustrating than usual, mainly because the question presented is narrow in scope. We are required to decide only which, if any, of the magazines in question are "hard-core pornography."

Early in January 1971 counsel for the appellants (Village Books) informed the appellee, the State's Attorney for Prince George's County (Marshall), that Village Books intended to open an "adult bookstore" in Prince George's County. Two days later counsel furnished Marshall with 100 samples of the books and magazines Village Books intended to sell. On 11 January Marshall filed

in the Circuit Court for Prince George's County an "Application for [the] Injunctive Relief" provided by Code (1971 Repl. Vol.), Art. 27, § 418A.[1] He also prayed the

---

1. "The circuit courts of the counties and the equity courts of the Supreme Bench of Baltimore City have jurisdiction to enjoin the sale or distribution of any book, magazine, or any other publication or article (including a motion picture film or showing) which is prohibited from sale or distribution, as hereinafter specified.

"1. The State's attorneys of the counties and Baltimore City in which a person, firm or corporation sells or distributes or is about to sell or distribute or has in his possession with intent to sell or distribute or is about to acquire possession with intent to sell or distribute any book, magazine, pamphlet, newspaper, story paper, writing paper, picture, card, drawing or photograph (including a motion picture film or showing) or any article or instrument of use which is obscene, within the meaning of § 418 of this article may maintain an action for an injunction against such person, firm or corporation in the circuit court of the counties or the equity courts of the Supreme Bench of Baltimore City to prevent the sale or further sale or the distribution or further distribution or the acquisition, publication or possession within this State of any book, magazine, pamphlet, newspaper, story paper, writing paper, picture, card, drawing or photograph (including a motion picture film or showing), or any article or instrument of use which is obscene.

"2. The person, firm, or corporation sought to be enjoined is entitled to a trial of the issues within one day after joinder of issue and a decision shall be rendered by the court within two days after the conclusion of the trial.

"3. In the event that an order or judgment be entered in favor of the State's attorney and against the person, firm or corporation sought to be enjoined, such final order or judgment shall contain a provision directing the person, firm or corporation to surrender to such peace officer as the court may direct or to the sheriff of the county in which the action was brought any of the matter described in this section and such sheriff or officer shall be directed to seize and destroy the same.

"4. In any action brought pursuant to the provisions of this section, the State's attorney is not required to file a bond before the issuance of an injunction order provided by this section, is not liable for costs and is not liable for damages sustained by reason of the injunction order in cases where judgment is rendered in favor of the person, firm or corporation sought to be enjoined.

"5. Every person, firm or corporation who sells, distributes or acquires possession with intent to sell or distribute any of the matter described in this section, after the service upon him of a summons and complaint in an action brought by the State's attorney of the county or Baltimore City pursuant to this section is chargeable with knowledge of the contents thereof."

issuance of the ex parte injunction provided by Maryland Rule BB72.[2] In his complaint Marshall said he had reviewed the samples and, he avowed, they were obscene within the meaning of Art. 27, § 417.[3] He stated he had

2. "a. *When May Be Granted.*

"Any ex parte injunction shall not be granted unless it appears from specific facts shown by affidavit, or a verified pleading with or without supporting affidavit or sworn testimony, that immediate, substantial and irreparable injury will result to the applicant before an adversary hearing can be had. The judge to whom application is made for an ex parte injunction may, in his discretion, communicate informally with the person against whom the injunction is sought, or his attorney, prior to taking action upon the application.

"b. *Service—Contents—Expiration—Extension.*

"An ex parte injunction shall be served forthwith on the adverse party by the quickest possible means; it shall give the adverse party leave to move for a hearing on not more than two days' notice; and it shall expire by its terms within such time after entry as the court may fix. Such time shall not exceed ten days, in case of a resident, and shall not exceed thirty-five days, in case of a non-resident. The court may within the time so fixed, for good cause shown, extend such time for a like period or for a longer period if the party against whom the injunction is directed consents.

"c. *Motion for Relief—Early Hearing.*

"A motion for relief against an ex parte injunction shall be set down for hearing at the earliest possible time.

"d. *Hearing—Burden on Applicant—Dissolution.*

"At the hearing, the applicant who obtained the ex parte injunction shall have the burden of showing the necessity or propriety of continuing the injunction, and if he does not, the court shall dissolve the injunction."

3. "As used in this subtitle,

"(1) *'Matter'* means any book, magazine, newspaper, or other printed or written material or any picture, drawing, photograph, motion picture, or other pictorial representation or any statue or other figure, or any recording, transcription or mechanical, chemical or electrical reproduction or any other articles, equipment, machines or materials.

"(2) *'Person'* means any individual, partnership, firm, association, corporation, or other legal entity, but shall not be construed to include an employee or any individual, partnership, firm, association, corporation, or other legal entity operating a theatre which shows motion pictures if the employee is not an officer thereof or has no financial interest therein other than receiving salary and wages.

"(3) *'Distribute'* means to transfer possession of, whether with or without consideration.

"(4) *'Knowingly'* means having knowledge of the character and content of the subject matter."

advised counsel for Village Books that his clients "would be prosecuted should they attempt to sell such obscene publications." Counsel responded he would see him (Marshall) in court. The verification reflects nothing more than that "the facts contained in [the application] are true to the best of [Marshall's] knowledge and belief." In his prayer for relief Marshall sought a "temporary" order commanding Village Books to cease and desist violating the statute. Such an order was passed forthwith. The order also required the "matter [to] be set down for hearing as prescribed by Art. 27, Sec. 418A 2."

We have not found in the transcript anything which would enable us to say with certainty that the order was ever served on Village Books. In any event the order seems to have been passed improvidently. There was no assertion of "specific facts" from which it might appear "that immediate, substantial and irreparable injury * * * [would] result to the applicant before an adversary hearing * * * [could] be had." Rule BB72 a. Nor were the requirements of BB72 b observed.

Village Books answered on 27 January, admitting the essential allegations of the complaint, claiming First Amendment protection and demanding an "immediate hearing by jury trial" on all issues. On 2 February Marshall and counsel for Village Books met with the trial judge, Powers, J. (now C. J.), in chambers. Immediately after the meeting and before the hearing in open court Judge Powers denied Village Books' motion to dismiss; Marshall was allowed, without objection, to amend his application so as to reduce the number of items claimed to be obscene from 100 to 21.

Counsel for Village Books insists Judge Powers denied his request for a trial by jury but the transcript seems not to reflect any such ruling. The point was not pressed at argument but since it was raised in the brief we shall discuss it later in this opinion.

Directly following the discussion in chambers the hearing in open court got under way. Marshall offered the

magazines and, without objection, they became Plaintiff's Exhibits 1 through 21. Declaring the exhibits to be hard core pornography, requiring no further proof, he rested his case.

Village Books produced as the first of its two witnesses Dr. Richard Kastner. His practice has been restricted to psychiatry for about ten years. He said he had gone through the books but that there might be one or two he had not seen. In respect of Number 1, "Fun and Games" he was asked if he could "voice an opinion as to whether or not that magazine's dominant theme, considered as a whole, appeals to the prurient interest or not?" He replied, "Not particularly." The same question was put to him in respect of Number 2, "New Directions, No. 16." He replied:

> "Well, I have the same feeling about all of the literature here, and that is, the nature and quality of the photographic and contextual material here is not that unusual, nor is it that aberrant among the average practicing male and female in their sexual contacts, so whether it would appeal to their prurient interest really is an incidental thing. I don't think it would necessarily. And I would refer to all of these in general, as I have gone over them."

What follows is another excerpt from his testimony:

> "Q. In consideration of Exhibit No. 18, do you have any opinion whether or not that would appeal to the prurient interest of the so-called average homosexual?
>
> "THE COURT: Male homosexual?
>
> "MR. DIETZ [Counsel for Village Books]: Male.
>
> "THE WITNESS: Male homosexual, not particularly. Because if you understand the nature of homosexuality you will understand this is a way of life and, therefore, this is a wholly acceptable matter to them. If it is so, then this

book would merely be demonstrating their own normal behavior. If it is normal behavior to them I can't see how it would be lascivious."

The second witness was 23 year old Raymond Pechin. After three years' service in the Marine Corps he was employed, in 1969, by Potomac News Company. At the time of trial he was its national sales manager. Excerpts from his testimony follow.

"Q. As part of your duties with the Potomac News Company do you have the opportunity to travel, and if so explain to the court what you do, where you go, what type of places you visit? A. During the past two years I have traveled across the United States, to San Francisco; Los Angeles; Detroit, Flint, Michigan; Chicago; New York; Dallas; Houston; Philadelphia; Baltimore; and Washington.

"Q. How about Atlanta, Georgia? A. Yes, sir, Atlanta, Georgia, also. I just come back from a trip there.

"While at these places I visit adult book stores and ask how the merchandise is selling. If it is I take a re-order; if not I ask why. It's just in sales to make sure sales are all right."

\* \* \*

"Q. In your travels to the various book stores all over the United States have you had an opportunity to see the twenty-one magazines that are before you now and other magazines of that general type? A. Yes, sir. These are what are called in the business—called 'Beaver Books.' [4] They are not what we call 'hard-core pornography.' In Los Angeles, San Francisco, New York and Baltimore they sell outright hard-

4. The term "Beaver Books", we were told, connotes the prominent display of female pubic hair. To some of the exhibits counsel applied the term "split-beaver"; any dolt could guess its connotation.

core, no social redeeming texts whatsoever. It's just nothing but pictures of hard-core pornography. In the Washington area it's much more restricted. Baltimore, New York and the two cities in California are the most wide open.

"Q. Material like these twenty-one magazines that you have before you, are they sold on a nation-wide basis, and if so are there a lot of sales or small amount of sales? A. Oh, yes, these are sold on a nation-wide basis. Books such as this one (indicating) sells a minimum of, like, ten thousand."

\* \* \*

"Q. You mentioned you traveled to the cities that you mentioned going to adult book stores. Could you tell us what an adult book store is? A. In an adult book store in Washington you must be eighteen years of age to get in, eighteen or twenty-one, depending upon the owner of that store. Across the nation I'd say 95 per cent of them are very strict and make you be at least eighteen to get in. And they figure a person eighteen years of age can look at—at nude pictures, I suppose. But this is the age set on it. It has nothing but adult books, magazines, adult pocket books."

\* \* \*

"Q. Are you a member of any organization in the community, such as the P.T.A., the Rotary Club or—. A. No, but I will join the P.T.A. when my children are old enough to go to school.

"Q. Are you familiar with the contemporary community standards relating to the description or representation of sexual matters? A. Not particularly. I'm not qualified like a doctor would be. I know what appeals to me, what I would like to look at. If anything did offend me I wouldn't look at it. It's just like a radio sta-

tion, if I don't like what's on the radio I turn the channel.

"Q. You know what sells? A. Yes."

Judge Powers enjoined Village Books "from any sale, distribution, or possession with intent to sell or distribute the following magazines:

1. Fun and Games, Volume 2 No. 1
2. New Directions No. 16
3. Nude Lark No. 29
4. One plus One Volume 2 No. 1
5. Yum Yum No. 2
6. Love Date Volume 1 No. 1
7. Yum Yum
8. Sex Confidential
9. Naked Love Number Seven
10. Eclipse Vol. 1, No. 3
11. Eclipse Vol. 1, No. 4
12. Masturbation and Youth
13. Auto-Fellatio & Masturbation
14. The Boy Lovers
15. Ted & Blair
16. Nudist Youth No. 9
17. Allen & Jim
18. Teen Nude"

The concluding paragraph of his order called for the surrender and destruction of the magazines.

We shall consider first Numbers 1 through 11. During argument counsel for Village Books called them "garbage." He also identified them, in the argot of the trade, as "split-beavers." The magazines differ from each other but very little. In the main they consist of good to excellent professional photographs of nude young adults together with varying amounts of textual material. There are females alone; there are male and female couples; there are trios—two females and one male or two males and one female; there are quartets—two females and two males. There is an indiscriminate mixture of blacks

(male and female) and whites (male and female). They have been photographed in a wide variety of poses, postures, positions and arrangements. Their facial expressions range from utterly blank to lewd and lively. All of the photographs have in common the conspicuous display of the genital area, flaunting it in explicit and chromatic detail. Oddly enough, and as counsel for Village Books was quick to emphasize, no penis is either fully erect or tumescent. Although some photographs suggest that sexual activity is but inches and seconds away the depiction of actual fellatio, cunnilingus, pederasty, copulation, masturbation or any other subsidiary variation of those activities has been studiously avoided. In general (except Number 8) the accompanying texts are innocuous.

Before we proceed to make our independent constitutional appraisal of the exhibits, as required by *Jacobellis v. Ohio,* 378 U. S. 184 (1964), we must first give some thought to what is meant by the expression "hard core pornography." In *Hewitt v. Maryland Board of Censors,* 254 Md. 179, 196 (1969), Judges Barnes said, for the Court:

> "In our opinion, the most apt definition of 'hard core pornography' we have seen is that given by Judge Fuld [now Chief Judge] of the Court of Appeals of New York in *People v. Richmond County News, Inc.,* 9 N.Y.2d 578, 216 N.Y.S.2d 369, 175 N.E.2d 681 (1961), cited with approval by the Court of Special Appeals in *Levin v. State,* 1 Md. App. 139, 145, 228 A. 2d 487, 489 (1967), *cert. denied,* 389 U. S. 1048, 88 S. Ct. 767, 19 L.Ed.2d 840 (1968) :
> " 'It [hard core pornography] focuses predominantly upon what is sexually morbid, grossly perverse and bizarre, without any artistic or scientific purpose or justification. Recognizable "by the insult it offers, invariably, to sex, and to the human spirit" ' (D. H. Lawrence, Pornog-

raphy and Obscenity [1930], p. 12), it is to be differentiated from the bawdy and the ribald. Depicting dirt for dirt's sake, the obscene is the vile, rather than the coarse, the blow to sense, not merely to sensibility. It smacks, at times, of fantasy and unreality, of sexual perversion and sickness and represents, * * * "a debauchery of the sexual faculty".' "

In respect of the instant case we think what Judge Fuld went on to say is of some significance, despite the strong dissent in which two members of his court joined.

"* * * The fact is, however, that, while the magazine contains many stories or pictures which are aesthetically tasteless and without any redeeming social worth, none of them is pornographic. Numerous pictures and cartoons of nude or semi-nude women and numerous descriptions and depictions of sexual arousal and satisfaction are to be found in 'Gent,' but it contains nothing which smacks of sick and blatantly perverse sexuality. Whether or not, therefore, the defendant had previous knowledge or notice of the content of the magazine, we may not say that its sale constituted a violation of our obscenity statute.

"Were we to judge the magazine before us in terms of our personal views of its social value, of its moral and aesthetic worth, we would condemn it out of hand for its vulgarity no less than for its banality. Basic principles of jurisprudence, however, command us to put to one side all personal predilections, including our distaste for commercial exploitation of sensuality. It is our conclusion that the magazine, appraised as objectively as is possible in the light of First Amendment concepts, may not be adjudged obscene without impairing the vital

social interest in freedom of expression." 175 N.E.2d at 686.

In his concurring opinion in *Jacobellis* Mr. Justice Stewart compounded the confusion when he said:

> "I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description [hard core pornography]; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it * * *." 378 U. S. at 197.

In a later dissent, however, *Ginzburg v. United States*, 383 U. S. 463, 499 (1966), he said:

> "In order to prevent any possible misunderstanding, I have set out in the margin a description, borrowed from the Solicitor General's brief, of the kind of thing to which I have reference."

The Solicitor General's description follows:

> "* * * Such materials include photographs, both still and motion picture, with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character. They also include strips of drawings in comic-book format grossly depicting similar activities in an exaggerated fashion * * *."

In the per curiam opinion in *Redrup v. New York*, 386 U. S. 767 (1967), the Supreme Court reversed a New York and a Kentucky conviction and an Arkansas injunction in cases much like the case at bar. There the books and magazines bore names such as Lust Pool, Shame Agent, High Heels, Spree, Gent, Swank and Bachelor. The Court said:

> "In none of the cases was there a claim that the state in question reflected a specific and lim-

ited state concern for juveniles. See *Prince v. Massachusetts,* 321 U. S. 158; cf. *Butler v. Michigan,* 352 U. S. 380. In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it. Cf. *Breard v. Alexandria,* 341 U. S. 622; *Public Utilities Comm'n v. Pollak,* 343 U. S. 451. And in none was there evidence of the sort of 'pandering' which the Court found significant in *Ginzburg v. United States,* 383 U. S. 463." 386 U. S. at 769.

In *Central Magazine Sales, Ltd. v. United States,* 389 U. S. 50 (1967), the Supreme Court reversed, w'thout opinion, citing only *Redrup,* a finding of the trial court (253 F. Supp. 485) that the magazine "Exclusive," containing photographs much like the ones in the case at bar, was obscene (i.e., hard core), a finding which had been affirmed on appeal (373 F. 2d 633).

The Supreme Court has also reversed, without opinion, citing only *Redrup,* findings of both state and federal courts declaring magazines to be obscene which contained photographs of nude males and females and in which the genitalia were conspicuously displayed. *Bloss v. Dykema,* 398 U. S. 278 (1970) ; *Carlos v. New York,* 396 U. S. 119 (1969) ; *I. M. Amusement Corp. v. Ohio,* 389 U. S. 573 (1968) ; *Conner v. City of Hammond,* 389 U. S. 48 (1967) ; *Potomac News Co. v. United States,* 389 U. S. 47 (1967) ; *Mazes v. Ohio,* 388 U. S. 453 (1967) ; *A Quantity of Books v. Kansas,* 388 U. S. 452 (1967) .

The precise meaning of "hard core pornography" continues to elude us and other courts as well. Perhaps a completely satisfactory definition will never evolve. What has been said in this regard, however, leads us to conclude, reluctantly to be sure, that this "garbage," whatever else it may be, is not hard core pornography. But, as we hinted early on, Number 8 "Sex Confidential"

is "garbage" of another color. The cover guarantees the contents to be *"Positively* Adult Entertainment." (Emphasis added.) The photographs are accompanied by four texts entitled "Sex Set Up for Single Swingers," "Sister Sex-Act," "Dial-a-Dish" and "The Whole World is Going Lesi!" They implement, in randy detail, all that the photographs suggest. The following excerpt will dispel any doubt that this is indeed hard core.

> "* * * Then he placed me in this great leather chair with my legs straddling the arm rests. My crotch was smack dab in the middle of his field of vision. He picked up a scoop of ice cream with his hands and Splat! Right on target. Well, at least that's all he did . . . for a half hour. My sister wasn't so lucky. Some creep with a silver tipped riding crop got her. She couldn't walk for two days!"

No useful purpose will be served by a discussion of Numbers 12 and 13. We are fully persuaded that by any standard they are hard core pornography.

Even if the photographs of the nude males in Numbers 15 and 17 could not be condemned as hard core the accompanying texts thrust them squarely into that category.

We are uncertain about Number 14, "The Boy Lovers." The photographs show young nude males in affectionate proximity. Their genitals are conspicuously displayed but in none is there an erection. The accompanying text purports to be a serious and clinical discussion of sodomy and homosexuality from the age of Socrates to the present. This is perhaps one of those "close" cases which are said to enjoy constitutional protection because of the absence of any evidence suggesting sales to juveniles, an assault upon individual privacy, or the sort of pandering found significant in *Ginzburg. Redrup.* Here it will be the beneficiary of our uncertainty.

Numbers 16 and 18, "Nudist Youth" and "Teen Nude,"

are a collection of photographs, "in Spectracolor," of nude young males whose genitals are prominently displayed. Anyone examining these exhibits will be conscious of two things: these youngsters are generously endowed; their countenances reflect a smug awareness of that fact. There is no accompanying text. Again reluctantly we feel bound to conclude that these two exhibits are not hard core.

We express no opinion as to whether Numbers 1 through 7, 9, 10, 11, 14, 16 and 18 could have survived the application of the *Roth-Alberts* (*Roth v. United States,* 354 U. S. 476 (1957)) test in its present stance. *Hewitt* (254 Md.). Marshall produced no testimony, expert or otherwise. As we have said, he offered only the magazines themselves. *Dunn v. Maryland Board of Censors,* 240 Md. 249, 255 (1965). The suggestion that the two witnesses produced by Village Books have supplied the necessary testimony must be rejected. Viewed in a most charitable light it is clearly inadequate. In this regard, of course, it should be remembered that the determination of obscenity (hard core pornography) is a question of law to be decided by the court. If the decision requires the support of testimony then the material can hardly be hard core. *Jacobellis; Dunn; Hewitt v. Maryland Board of Censors,* 243 Md. 574 (1966).

We come now to Village Books' attack on the constitutionality of the statute (§ 418A). The first of its two grounds is that the statute provides for a prior restraint of "presumptively protected literary material," for an indefinite term, until the conclusion of a hearing on the merits. Next, it contends, the statute "does not provide for a trial by jury on the issue of obscenity."

In any consideration of the prior restraint question it should be observed that § 418A is, except in irrelevant detail, a carbon copy of the New York statute, § 22-a of the New York Code of Criminal Procedure, which was before the Supreme Court in *Kingsley Books, Inc. v. Brown,* 354 U. S. 436 (1957). There the appellants were

ordered "to show cause within four days why they should not be enjoined from distributing" the material alleged to be obscene. They consented, however, to the granting of the injunction *pendente lite*. They did not exercise their right to an immediate joinder of issue. The trial judge, sitting in equity, later found the material to be obscene and ordered it destroyed. The finding of obscenity was not challenged. It is interesting to note that the appellants (in *Kingsley*) did not ask for a jury trial, they made no point of the fact that the statute did not require a jury trial, nor did they take that issue to the Supreme Court. The judgments below were affirmed. Mr. Justice Frankfurter, who spoke for the majority, said:

"The judicial angle of vision in testing the validity of a statute like § 22-a is 'the operation and effect of the statute in substance.' * * * The phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic text. The duty of closer analysis and critical judgment in applying the thought behind the phrase has thus been authoritatively put by one who brings weighty learning to his support of constitutionally protected liberties: 'What is needed,' writes Professor Paul A. Freund, 'is a pragmatic assessment of its operation in the particular circumstances. The generalization that prior restraint is particularly obnoxious in civil liberties cases must yield to more particularistic analysis.' The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533, 539.

"Wherein does § 22-a differ in its effective operation from the type of statute upheld in *Alberts?* Section 311 of California's Penal Code provides that 'Every person who wilfully and lewdly * * * keeps for sale * * * any obscene * * * book * * * is guilty of a misdemeanor * * *.' Section 1141 of New York's Penal Law is similar. One would be bold to as-

sert that the *in terrorem* effect of such statutes less restrains booksellers in the period before the law strikes than does § 22-a. Instead of requiring the bookseller to dread that the offer for sale of a book may, without prior warning, subject him to a criminal prosecution with the hazard of imprisonment, the civil procedure assures him that such consequences cannot follow unless he ignores a court order specifically directed to him for a prompt and carefully circumscribed determination of the issue of obscenity. Until then, he may keep the book for sale and sell it on his own judgment rather than steer 'nervously among the treacherous shoals.' Warburg, Onward and Upward With The Arts, The New Yorker, April 20, 1957, 98, 101, in connection with *R. v. Martin Secker Warburg, Ltd.,* [1954] 2 All Eng. 683 (C.C.C.)." 354 U. S. at 441-42.

*Kingsley* has generated much discussion but there can be no doubt that it is dispositive of Village Books' prior restraint argument. *See Prior Adversary Hearings on the Question of Obscenity,* 70 Colum. L. Rev. 1403 (1970) ; *The Prior Adversary Hearing: Solution to Procedural Due Process Problems in Obscenity Seizures?* 46 N.Y.U. L. Rev. 80 (1971). Indeed in the instant case it is clear that there was no prior restraint and it is clear also that Village Books had no intention of selling the magazines at least until after Judge Powers' decision.

Village Books makes much of Mr. Justice Brennan's dissenting opinion in *Kingsley.* He said there:

"The jury represents a cross-section of the community and has a special aptitude for reflecting the view of the average person. Jury trial of obscenity therefore provides a peculiarly competent application of the standard for judging obscenity which, by its definition, calls for

an appraisal of material according to the average person's application of contemporary community standards. A statute which does not afford the defendant, of right, a jury determination of obscenity falls short, in my view, of giving proper effect to the standard fashioned as the necessary safeguard demanded by the freedoms of speech and press for material which is not obscene. Of course, as with jury questions generally, the trial judge must initially determine that there is a jury question, *i.e.*, that reasonable men may differ whether the material is obscene." 354 U. S. at 448.

It is well known, of course, that he changed his views in this regard later on. In *Jacobellis* he said:

"It has been suggested that this is a task in which our Court need not involve itself. We are told that the determination whether a particular motion picture, book, or other work of expression is obscene can be treated as a purely factual judgment on which a jury's verdict is all but conclusive, or that in any event the decision can be left essentially to state and lower federal courts, with this Court exercising only a limited review such as that needed to determine whether the ruling below is supported by 'sufficient evidence.' The suggestion is appealing, since it would lift from our shoulders a difficult, recurring, and unpleasant task. But we cannot accept it. Such an abnegation of judicial supervision in this field would be inconsistent with our duty to uphold the constitutional guarantees. Since it is only 'obscenity' that is excluded from the constitutional protection, the question whether a particular work is obscene necessarily implicates an issue of constitutional law. See *Roth v. United States, supra,* 354 U. S. at 497-

98 (separate opinion). Such an issue, we think, must ultimately be decided by this Court. Our duty admits of no 'substitute for facing up to the tough individual problems of constitutional judgment involved in every obscenity case.' " 378 U. S. at 187-88.

Perhaps the terse and complete answer to this contention is that in the Maryland equity courts there is absolutely no provision for the use of a jury to resolve questions of fact. That is the exclusive province of the chancellor. Maryland Rule 517. And it does not seem to us that resolution by a judge rather than a jury violates any constitutional guarantees. *Jacobellis.*

We shall modify Judge Powers' order of 8 February 1971 by deleting therefrom Numbers 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 14, 16 and 18.

*Order modified and as modified affirmed.*
*Costs to be paid by appellants.*