## JOHN EBERT, ETC. *v.* MARYLAND STATE BOARD OF CENSORS

[No. 172, September Term, 1973.]

*Decided November 6, 1973.*

302

The cause was argued before ORTH, C. J., and THOMPSON and MENCHINE, JJ.

*James R. White* and *Arthur M. Schwartz* for appellant.

*Daniel Doherty,* with whom were *Francis B. Burch, Attorney General,* and *Josef E. Rosenblatt, Assistant Attorney General,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

This appeal concerns the power of the State to regulate the exhibition of motion picture films. The specific question posed is whether an order of the Circuit Court in Baltimore City, entered 22 March 1973, disapproving 30 peep show films submitted for licensing by Ellwest Stereo Theatres, Inc. (Stereo) through its agent John Ebert, was proper. We vacate the order and remand the case for further proceedings.

I

At long last the Supreme Court of the United States has attempted to clarify the muddled law surrounding the regulation of obscenity vis-a-vis the constitutional right of free speech. On 21 June 1973 it decided five cases: *Miller v. California,* 413 U. S. 15, 93 S. Ct. 2607; *Paris Adult Theatre I v. Slaton,* 413 U. S. 49, 93 S. Ct. 2628; *United States v. 12 200-Ft. Reels of Super 8 MM. Film,* 413 U. S. 123, 93 S. Ct. 2665; *United States v. Orito,* 413 U. S. 139, 93 S. Ct. 2674; and *Kaplan v. California,* 413 U. S. 115, 93 S. Ct. 2680. The

"tortured history" of the Court's obscenity decisions was marked by the divisiveness of the Justices. The Court had categorically settled one thing, that obscene material is unprotected by the First Amendment. *Roth v. United States,* 354 U. S. 476, 485, 77 S. Ct. 1304, 1309. But "[a]part from the initial formulation in the *Roth* case, no majority of the Court has at any given time been able to agree on a standard to determine what constitutes obscene, pornographic material subject to regulation under the States' police power." *Miller,* 413 U. S. at 22, 93 S. Ct. at 2614. Nine years after the *Roth* decision, in *Memoirs v. Massachusetts* (the Fanny Hill case), 383 U. S. 413, 86 S. Ct. 975, the Court veered sharply away from the *Roth* concept, and with only three Justices in the plurality opinion, articulated a new test of obscenity.[1] Even that test was eventually abandoned as unworkable by its author (see the dissenting opinion of Mr. Justice Brennan in *Paris,* 413 U. S. at 69, 93 S. Ct. at 2642) and no member of the Court today supports the *Memoirs* formulation. *Miller,* 413 U. S. at 73, 93 S. Ct. at 2614. In the absence of a majority view, the Court, in *Redrup v. New York,* 386 U. S. 767, 87 S. Ct. 1414, adopted the unhappy expedient, and followed it thereafter in a number of cases, of summarily reversing convictions for the dissemination of materials that at least five members of the Court, applying their separate tests, found to be protected by the First Amendment. *Miller,* n. 3. Although the Court recognized that the States had a legitimate interest in prohibiting dissemination or exhibition of obscene material, *Stanley v. Georgia,* 394 U. S. 557, 567, 89 S. Ct. 1243, 1249; *Ginsberg v. New York,* 390 U. S. 629, 637-643, 88 S. Ct. 1274, 1279-1282, the States were left completely at loose ends with an unworkable test that, in any event, was not the law of the land because it did not represent a majority of the court.[2]

---

**1.** *Roth* presumed "obscenity" to be "utterly without redeeming social value." *Memoirs* required that to prove obscenity it must be affirmatively established that the material is *"utterly* without redeeming social value."

**2.** The comment of the Court on the point in Miller, U. S. at , 93 S. Ct. at 2617, is, at best, an understatement: "It is certainly true that the absence, since *Roth,* of a single majority view of this Court as to proper standards for testing obscenity has placed a strain on both state and federal courts."

## II

In *Miller* and its siblings a bare majority of the Supreme Court agreed on what it described as "concrete guidelines" to isolate obscenity from expression protected by the First Amendment and attempted to provide "positive guidance" to the federal and state courts alike.[3]

### Obscene Material

The Court in *Miller*, n. 2, 413 U. S. at 18, 93 S. Ct. at 2612, noted that the words "obscene material", as used therein, had a specific judicial meaning which derived from the *Roth* case, *i.e.*, obscene material "which deals with sex." It explained:

> "This Court has defined 'obscene material' as 'material which deals with sex in a manner appealing to prurient interest,' Roth v. United States, 354 U. S. 476, 487, 77 S. Ct. 1304, 1310, 1 L.Ed.2d 1498 (1957), but the *Roth* definition does not reflect the precise meaning of 'obscene' as traditionally used in the English language. Derived from the Latin *obscaenus, ob*, to, plus *caenum*, filth, 'obscene' is defined in the Webster's New International Dictionary (Unabridged, 3d ed., 1969) as '1a: disgusting to the senses . . . b: grossly repugnant to the generally accepted notions of what is appropriate . . . 2: offensive or revolting as countering or violating some ideal or principle.' The Oxford English Dictionary (1933 ed.) gives a similar definition, 'offensive to the senses, or to taste or refinement, disgusting, repulsive, filthy, foul, abominable, loathsome.'

The material we are discussing in this case is

---

**3.** In each case Mr. Chief Justice Burger delivered the opinion of the Court, and Mr. Justice Brennan filed a dissenting opinion in which Mr. Justice Stewart and Mr. Justice Marshall joined. Mr. Justice Douglas filed a dissenting opinion in each case with the exception of *Kaplan*. As to *Kaplan* he stated that he would have vacated the judgment and remanded for dismissal of the criminal complaint.

more accurately defined as 'pornography' or 'pornographic material.' 'Pornograph' derives from the Greek *(porne*, harlot, and *graphos*, writing). The word now means '1: a description of prostitutes, or prostitution. 2: a depiction (as in writing or painting) of licentiousness or lewdness: a portrayal of erotic behaviour designed to cause sexual excitement.' Webster's New International Dictionary, *supra.* Pornographic material which is obscene forms a subgroup of all 'obscene' expression, but not the whole, at least as the word 'obscene' is now used in our language."

We find it clear, however, that the Court was equating "obscene material" with hard core pornography. It said, 413 U. S. at 27, 93 S. Ct. at 2616: "Under the holdings announced today, no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct * * *." It pointed out, 413 U. S. at 28, 93 S. Ct. at 2617: "If the inability to define regulated materials with ultimate, god-like precision altogether removes the power of the States or the Congress to regulate, then 'hard core' pornography may be exposed without limit to the juvenile, the passerby, and the consenting adult alike, as, indeed, Mr. Justice Douglas contends." And it referred to the agreement of the majority on concrete guidelines "to isolate 'hard core' pornography from expression protected by the First Amendment." *Idem.* It observed, in discussing the protection given speech and press to assure unfettered interchange of ideas, that "the public portrayal of hard core sexual conduct for its own sake, and for the ensuing commercial gain, is a different matter." 413 U. S. at 35, 93 S. Ct. at 2621. See *Hewitt v. Board of Censors*, 243 Md. 574; *Donnenberg v. State*, 1 Md. App. 591; *Levin v. State*, 1 Md. App. 139.

*The Permissible Scope of Regulation*

Because it is obscene material which is without the ambit of First Amendment protection, and as obscene material in

its specific judicial meaning "deals with sex" in the concept of hard core pornography, the permissible scope of regulation is confined to works which depict or describe such sexual conduct.[4] That conduct must be specifically defined by the applicable state law. The Court emphasized that it was not its function to propose regulatory schemes for the States, but it nevertheless gave "a few plain examples of what a state statute could define for regulation":

> "(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
>
> (b) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Miller*, 413 U. S. at 25, 93 S. Ct. at 2615.

Also state regulation must be limited to works "which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Miller*, 413 U. S. at 25, 93 S. Ct. at 2615.

A state statute which is so limited in its regulation of obscenity is constitutional. It is not necessary, however, that the States desiring to regulate obscene material must now enact new statutes. Existing state statutes "as construed heretofore or hereafter, may well be adequate." *Miller*, n. 6, 413 U. S. at 24, 93 S. Ct. at 2615. The Court made clear that the applicable State statute may contain the required definitions either as written "or authoritatively construed." *Idem*. It pointed to the alternative of judicial construction throughout *Miller* in referring to the limitations in a regulating state law "as written or construed." Of course,

---

**4.** Expression by words alone can be legally "obscene" in the sense of being unprotected by the First Amendment. "Obscenity can, of course, manifest itself in conduct, in the pictoral representation of conduct, or in the written and oral description of conduct. The Court has applied similarly conceived First Amendment standards to moving pictures, to photographs and to words in books." *Kaplan v. California*, 413 U. S. at 119, 93 S. Ct. at 2683-2684.

the Legislature could always define other specific "hard core" conduct.

In *United States v. 12 200-Ft. Reels of Super 8 MM. Film, supra,* n. 7, 413 U. S. at 130, 93 S. Ct. at 2670, the Court, after observing that it must leave to state courts the construction of state legislation, noted that it had a duty to construe authoritatively federal statutes where a serious doubt of constitutionality is involved. It said:

> "If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene', 'lewd', 'lascivious', 'filthy', 'indecent', or 'immoral' as used to describe regulated material [in federal statutes], we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard-core' sexual conduct given as examples in Miller v. California, supra, 413 U. S. at 25, 93 S. Ct. at pp. 2615-2616.

## The Determination of Obscenity

Under the authority of a statute which, as written or construed, is constitutionally limited in accordance with the *Miller* dictates, it is for the trier of fact in a judicial proceeding to determine whether the material challenged is obscene.[5] The trier of fact may make this determination from the alleged obscene material itself. In *Paris,* the Court held that it was not error to fail to require "expert" affirmative evidence that the materials were obscene when

---

**5.** The Court believed that if a state law that regulates obscene material is thus limited, "the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary." *Miller,* 413 U. S. at 25, 93 S. Ct. at 2615. The appellate courts of Maryland have this power.

The Court further observed: "The mere fact juries [or judges in bench trials] may reach different conclusions as to the same material does not mean that constitutional rights are abridged." It said: "In resolving the inevitably sensitive questions of fact and law, we must continue to rely on the jury system, accompanied by the safeguards that judges, rules of evidence, presumption of innocence [in criminal prosecutions] and other protective features provide * * *." *Miller,* 413 U. S. at 26, 93 S. Ct. at 2616.

the materials themselves were actually placed in evidence. It said, 413 U. S. at 56, 93 S. Ct. 2634: "The films, obviously, are the best evidence of what they represent. 'In the cases in which this Court has decided obscenity questions since *Roth*, it has regarded the materials as sufficient in themselves for the determination of the question." It noted, n. 6:

> "This is not a subject that lends itself to the traditional use of expert testimony. Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand. Cf. Wigmore on Evidence (3d ed.), § § 556, 559. No such assistance is needed by jurors in obscenity cases; indeed the 'expert witness' practices employed in these cases have often made a mockery out of the otherwise sound concept of expert testimony * * * 'Simply stated hard core pornography . . . can and does speak for itself.' United States v. Wild, *supra*, 422 F.2d, at 36 (CA2 1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971)." [6]

In *Kaplan* the Court referred to its holding in *Paris*. It said, 131 U. S. at 121, 93 S. Ct. at 2685: "We also reject in Paris Adult Theatre I v. Slaton, *supra*, any constitutional need for 'expert' testimony on behalf of the prosecution, or for any other ancillary evidence of obscenity, once the allegedly obscene materials themselves are placed in evidence. *Paris Adult Theatre I, supra*, 413 U. S. at 56, 93 S. Ct. at 2634-2635 (1973). The defense should be free to introduce appropriate expert testimony * * *." It held that the prosecution's introduction of the book itself into evidence was sufficient, as a matter of constitutional law, to establish the book's obscenity.

Although the contested material can and does speak for

---

**6.** The Court reserved judgment, however, on the extreme case, where contested materials are directed at such a bizarre deviant group that the experience of the trier-of-fact would be plainly inadequate to judge whether the material appeals to the prurient interest.

itself, the Court dictated "basic guidelines" for the trier of fact. They must be:

> "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, * * *,
>
> (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and
>
> (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller,* 413 U. S. at 25, 93 S. Ct. at 2615 (citations omitted).

The Court expressly rejected, as constitutional standards, "the ambiguous concept of 'social importance'", and the "utterly without redeeming social value" test. *Miller,* 413 U. S. at 25, 93 S. Ct. at 2615 and note 7. "At a minimum, prurient, patently offensive depiction or description of sexual conduct must have serious literary, artistic, political, or scientific value to merit First Amendment protection." *Miller,* 413 U. S. at 26, 93 S. Ct. at 2616.[7]

The Court also settled doubt about the "contemporary community standards" to be applied, at least sufficiently for the State to adopt a rule. It concluded in *Miller* that "neither the State's alleged failure to offer evidence of 'national standards,' nor the trial court's charge that the jury consider state community standards, were constitutional errors. Nothing in the First Amendment requires that a jury must consider hypothetical and unascertainable 'national standards' when attempting to determine whether certain materials are obscene as a matter of fact." [8] 413 U. S. at 31,

---

7. It gave as example medical books for education of physicians and related personnel which necessarily use graphic illustrations and descriptions of human anatomy.

8. In holding in *Miller* that the requirement that the jury evaluate the materials with reference to "contemporary standards of the State of

93 S. Ct. at 2619. In *Kaplan*, 413 U. S. at 121, 93 S. Ct. at 2658, the Court affirmed that contemporary community standards of the State, as opposed to national standards, are constitutionally adequate to establish whether a work is obscene.

*Miller* and its companion cases gave guidance in other areas relating to the determination of obscenity. In *Miller* the Court, speaking of the legitimate interest of the States in regulating obscene material, indicated that such interest existed "when the mode of dissemination carries with it a significant danger of offending the sensibilities of unwilling recipients or of exposure to juveniles." 413 U. S. at 19, 93 S. Ct. at 2621. In *Paris*, however, the Court categorically disapproved the theory "that obscene, pornographic films acquire constitutional immunity from state regulation simply because they are exhibited for consenting adults only." 413 U. S. at 57, 93 S Ct. at 2635. It asserted that it had never declared that the only legitimate state interests were in regulating the exposure of obscene material to juveniles and unconsenting adults, and pointed out that the States "have a long-recognized legitimate interest in regulating the use of obscene material in local commerce and in all places of public accommodation, as long as these regulations do not run afoul of specific constitutional prohibitions." It said: "In particular, we hold that there are legitimate state interests at stake in stemming the tide of commercialized obscenity, even assuming it is feasible to

---

California" served the protective purpose and was constitutionally adequate, the Court said, 413 U. S. at 32, 93 S. Ct. at 2619-2620:

> "It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City. * * * People in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity. * * * [T]he primary concern with requiring a jury to apply the standard of 'the average person, applying contemporary community standards' is to be certain that, so far as material is not aimed at a deviant group, it will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person — or indeed a totally insensitive one."

And see note 13, 413 U. S. at 32, 93 S. Ct. at 2619.

enforce effective safeguards against exposure to juveniles and to the passerby." *Id.*

The Court discussed the right of privacy as affecting regulation of obscenity. Prior decisions of the Supreme Court recognizing a right of privacy guaranteed by the Fourteenth Amendment included "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.' " *Roe v. Wade,* 410 U. S. 113, 152, 93 S. Ct. 705, 726, quoting *Palko v. Connecticut,* 302 U. S. 319, 325. "This privacy right encompasses and protects the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing. * * * Nothing, however, in this Court's decisions intimates that there is any 'fundamental' privacy right 'implicit in the concept of ordered liberty' to watch obscene movies in places of public accommodation." *Paris,* 413 U. S. at 65, 93 S. Ct. at 2639-2640. In *Orito,* 413 U. S. at 141-144, 93 S. Ct. at 2677-2678 and *12 200-Ft. Reels,* 413 U. S. at 128, 93 S. Ct. at 2669, the Court reaffirmed prior holdings that commerce in obscene material is unprotected by any constitutional doctrine of privacy. In *Paris* it held "That the States have a legitimate interest in regulating commerce in obscene material and in regulating exhibition of obscene material in places of public accommodation, including so-called 'adult' theatres from which minors are excluded." 413 U. S. at 69, 93 S. Ct. at 2642.

We have one further observation. It is clear from the Court's opinion in *Paris, supra,* that the holdings of *Miller* and its siblings are as applicable to civil procedures for the regulation of dissemination and exhibition of obscene material as they are to criminal prosecutions. 413 U. S. at 18, 93 S. Ct. at 2633.

### III

In the light of the "concrete guidelines" and "positive guidance" now supplied by the Supreme Court, we look at the Maryland law.

The General Assembly of Maryland has made it a crime "to sell, lease, lend, exhibit or use any motion picture film or

view in the State of Maryland" unless it has been duly approved and licensed by the Maryland State Board of Censors (Board). Code, Art. 66 A, § 2. The Board was created by statutory enactment more than a half a century ago. Acts 1916, ch. 209. See Code, Art. 66 A, § 3. Much maligned and frequently attacked, it has in recent times become an endangered species, and today is unique, its counterparts in other States having become extinct. In Maryland it is viable and actively functioning; it is its action which started this case on the way to this Court.

*The Licensing Procedure*

The procedure for the approval or disapproval of films by the Board has by statutory amendment, Acts 1965, ch. 598, been tailored to fit the constitutional criteria dictated by *Freedman v. Maryland,* 380 U. S. 51, 85 S. Ct. 734. Code, Art. 66A, § 19 now requires that any film submitted to the Board for examination and licensing be reviewed and approved within 5 days unless it is disapproved, in which event the Board shall apply within 3 days to the Circuit Court of Baltimore City for a judicial determination. The Court shall conduct a hearing within 5 days and within 2 days thereafter shall enter its decree and order requiring that the film be approved and licensed or disapproved. If the film is disapproved the person presenting it for licensing may appeal such determination to this Court. Stereo does not contest the constitutionality of this procedure.

## THE LICENSING CRITERIA

*The State Statute as Written and Previously Construed*

Code, Art. 66A, § 6 (a) commands the Board to approve and license such films "which are moral and proper" and to disapprove such "as are obscene, or such as tend, in the judgment of the Board, to debase or corrupt morals or incite to crimes." The statute spells out what films are considered obscene, subsection (b), what films tend to debase or corrupt morals, subsection (c), and what films tend to incite to crime, subsection (d). The criteria of a tendency to debase or

corrupt morals and to incite to crime have heretofore been declared invalid on constitutional grounds by judicial decision. *Dunn v. Board of Censors*, 240 Md. 249, 252-254. "The only valid standard for disapproval of a film under the Act, therefore, is obscenity." *Sanza v. Maryland Board of Censors*, 245 Md. 319, 338.[9] In *Dunn*, however, the meaning of obscene as spelled out in § 6 (b) was held to be so broad as to be fatally at variance with the rulings of the Supreme Court as to what the State constitutionally can ban from the public's viewing. *Dunn* made clear that the standard of obscenity is limited to what can be deemed obscene in the constitutional sense. 240 Md. 252-254. At the time of *Dunn*, and thereafter until *Miller*, what was obscene in the constitutional sense was determined by the *Roth* test, and the Court of Appeals read the *Roth* definition of obscenity into the statute. Upon finding that decisions of the Supreme Court made it "manifest that only material which is obscene under the *Roth* test can be censored or suppressed by a state, and that a state may not effectively substitute its definition of what is obscene for the *Roth* definition," the Court held "that the right and power of the Board to ban films [and views] [10] as 'obscene' or as tending 'to debase or corrupt morals' under Sec. 6 of Art. 66A extend only to motion pictures [or views] which are obscene under the *Roth* test referred to and paraphrased in *Trans-Lux [Distributing Corp. v. Board of Censors*, 240 Md. 98] and in this opinion." *Dunn*, at 254. The Court of Appeals consistently applied the *Memoirs* formulation of the *Roth* test as adopted by it. See *Sanza v. Maryland Board of Censors, supra; Hewitt v. Maryland Board of Censors*, 254 Md. 179; *Wagonheim v. Maryland Board of Censors*, 255 Md. 297; *Hewitt v. Maryland Board of Censors*, 256 Md. 358; *Village Books v. State's Attorney*, 263 Md. 76, cert. granted by the Supreme

---

**9.** *Sanza* determined that the obscenity standard was severable, the invalidity of the other standards of § 6 not rendering the entire Act unconstitutional. 245 Md. at 338.

**10.** "The word 'film' * * * shall be construed to mean what is usually known as a motion picture film and shall include any film shown with or by new devices of any kind whatsoever, such as slot or coin machines, showing motion pictures. The word 'view' * * * shall be construed to mean what is usually known as a stereopticon view or slide." Code, Art. 66A, § 1.

Court of the United States; judgment vacated 25 June 1973 and cause remanded for further consideration in light of *Miller*, et al.; judgment reinstated and reaffirmed by order of Court of Appeals of 10 October 1973. See also *Marques v. State*, 267 Md. 542.

### The State Statute as Now Construed

The Supreme Court having jettisoned the *Memoirs* formulation of the *Roth* standard of obscenity, it is no longer a valid test for this State to follow. We discard it as burdensome, unworkable and unwanted. We turn to *Miller* and its siblings for the current standard of obscenity, and construe "obscene" as used in Art. 66 A in the light of those cases, not merely because the Supreme Court has said it is prepared to do so with respect to federal statutes, *12 200-Ft. Reels, supra*, and not merely because it has indicated the States are free to do so with respect to State statutes, *Miller, supra*, but primarily because the Court of Appeals of Maryland has declared that it is clear that the legislative intent was to authorize the Board "to disapprove films which are obscene by any valid test." *Sanza v. Maryland Board of Censors, supra*, at 339.[11] We therefore construe the statute as commanding the Board to disapprove any film or view which:

> (1) portrays sexual conduct in a patently offensive way in that it contains patently offensive:
>
> (a) representations or descriptions of ultimate sex acts, normal or perverted, actual or simulated; OR

---

**11.** The Legislature may adopt a more liberal view in regard to the regulation of obscene materials, or may even, if it chooses, leave the censoring of books, films and public displays to individual rejection of that which is found offensive by the repeal of the laws now in effect. "The States, of course, may follow such a 'laissez faire' policy [leaving regulation to individual 'free will'] and drop all controls on commercialized obscenity, if that is what they prefer, just as they can ignore consumer protection in the market place, but nothing in the Constitution *compels* the States to do so with regard to matters falling within state jurisdiction." *Paris Adult Theatre I v. Slaton, supra*, 413 U. S. at 64, 93 S. Ct. at 2639. It is a choice for the Legislature, not the courts, and at this moment, as evidenced by the laws enacted and controlling, the view of the Legislature is clear.

(b) representations or descriptions of masturbation, excretory functions, and lewd exhibitions of genitals; AND

(2) taken as a whole:

(a) would be found by the average person, applying contemporary community standards of the State, to appeal to the prurient interest in sex; AND

(b) does not have serious literary, artistic, political, or scientific value.

### The Procedure for Regulation of Exhibition of Films

The Board "shall examine or supervise the examination of all films or views to be exhibited or used in the State of Maryland." Code, Art. 66A, § 6. It shall approve and license such as are not obscene, and shall disapprove such as are obscene applying the *Miller* test as herein summarized. The Board must approve or disapprove within 5 days of the submission of the film. This action by the Board is not through an adversary proceeding. No evidence is considered by the Board except the film submitted to it by "the exchange, owner, or lessee." If the Board approves the film, it shall furnish a certificate in writing which shall be the license for such film. § 7. If the Board disapproves the film, it shall apply within 3 days thereafter to the Circuit Court of Baltimore City for a judicial determination whether the film is obscene. Within 5 days of such application the court shall conduct a hearing. This hearing is a plenary proceeding, adversary in nature. "The burden of proving that the film should not be approved and licensed shall rest on the Board." § 19. The burden of proof is by a preponderance of the evidence.[12] But the Board may present its case, as we have indicated, merely by placing into evidence the subject film,

---

12. We are concerned here only with the approval or disapproval of a film for exhibition. For those violations of Art. 66A, which are punishable as a crime upon trial in a court of competent jurisdiction, the guilt of the accused must be established beyond a reasonable doubt. See Code, Art. 66A, §§ 17, 18, 19 (b), 20, 21, and 22.

which the court is commanded by law, § 19, to view. The Board need not offer "expert testimony" on the issue of obscenity, for the films are "the best evidence of what they represent." The one seeking a license to exhibit the film, however, is free to introduce appropriate expert testimony. On the evidence adduced the court shall determine within 2 days of the hearing whether the film is obscene under the *Miller* standard, following its guidelines, and enter an appropriate decree.

If the decree disapproves the film as obscene, the person presenting the film may appeal to this Court in accordance with the Maryland Rules of Procedure. We are directed by law to view the subject film, § 19, and we make our independent constitutional appraisal from the entire record whether the film is without the protection of the First Amendment because it is obscene. *Miller,* 413 U. S. at 25, 93 S. Ct. at 2615.

## IV

Stereo submitted 30 peep show films to the Board for approval and licensing. The Board disapproved them as obscene under the *Roth-Alberts* test and applied to the Circuit Court of Baltimore City for a judicial determination. At the ensuing hearing the Board offered the films in evidence and rested its case. Stereo adduced evidence through the testimony of each of the three Board members, the agent for Stereo, and Dr. Robert Athanasiou, an Assistant Professor of Psychiatry and Instructor of Obstetrics and Gynecology at the Johns Hopkins School of Medicine and the Johns Hopkins Hospital. Dr. Athanasiou was received as an expert witness in the field of human sexuality after extensive examination as to his qualifications. It was his opinion, upon examination of the films, for reasons brought out in detail during the examination of him, that the films were not obscene as failing the *Roth-Alberts* criteria and the *Memoirs* test as well. The community standard applied was the national standard, which he believed they did not exceed.[13] And he

---

13. Dr. Athanasiou said: "In no way at all could anybody who is

thought that they were not utterly without redeeming social value. Asked to define "prurient", the Doctor said:

> "Well, it is a legal term. It is not a scientific term, but it has meaning in the scientific community because we have had need to deal with it in doing research for the Commission on Obscenity and Pornography, and in various other situations. I think its meaning is metaphorical. Literally, it is derived from the term in Latin which means to itch, and in terms of its operationalization for any kind of reasonable discussion I take it to mean a shameful or morbid interest in nudity, sex or excretion."

He discussed the distinction between a normal eroticism and a prurient appeal. He said there was no way at present to measure prurient appeal but there were means to measure sexual arousal. He felt that the films did not appeal to the prurient interest. On cross-examination, however, it was elicited that he could not give a definition of hard core pornography. "I could give you a definition of obscenity, but not of hard core pornography. The problem is that pornography can be not obscene. Fannie Hill, for example, is pornography, but it is not obscene. I think there would be a difference between pornography and obscenity."

The chancellor determined that the films were hard core pornography. In reaching this conclusion he held that the expert witness "disqualified himself from being able to render a valid opinion [that the films were not obscene] because he stated he was unable to define hard core pornography; he was unable to define prurient * * *." The chancellor conceded: "I would be less than candid if I did not state that the testimony of the expert raised doubt in my

---

reasonably familiar with contemporary community standards possibly ever say these films exceeded them. Films which are playing throughout the United States are far, far more explicit. Movies which I have seen in Buffalo, New York, and Minneapolis, Minnesota have been judged non-obscene by juries in those towns, and they are far more explicit than these films. There is no question whatsoever that these fall well within contemporary standards with regard to the display of nudity and sex."

318

mind as I listened to it. However, as I reflected upon it and considered it in the light of the law of obscenity, I found that that doubt did not rise to the standard of reasonable doubt * * *."

The chancellor's determination was predicated upon his finding that the films were hard core pornography.[14] But, of course, he did not have the benefit of *Miller* and its siblings, which established a new formulation for hard core pornography. And in effect, he excluded the testimony of the expert witness for Stereo.[15]

We think that Stereo is entitled to a rehearing below at which a judicial determination shall be made whether the films it seeks to exhibit are obscene under the *Miller* standard as construed herein after due consideration by the trier of fact of basic guidelines spelled out in *Miller*. The films themselves may be sufficient, as a matter of federal constitutional law, to support a determination without any constitutional need for "expert" testimony on the part of the Board. Stereo, however, shall be free to introduce appropriate expert testimony.[16]

The order of 22 March 1973 is vacated and the case remanded to the Circuit Court of Baltimore City for further

---

**14.** At the trial all 30 films were treated as a unit. The court observed in rendering its opinion: "I might say at this stage, and not repeat it, that everyone, including the expert witness, the State and the Respondent, has treated the thirty films almost as a unit. There has been no effort in this case to take and deal with them individually and say, well, this one is less obscene than the other or more obscene than the other; less doubtful or more doubtful. Therefore, the Court is not going to undertake to go through and treat each of the motion pictures. They were not treated by the parties that way in the evidence presented. Although there was comment from time to time as to individual films, the general tenor of the trial was to treat them as the thirty films. In my decision, I have so dealt with them and will so deal with them in giving my reasons for the decision."

**15.** We note that the Court of Appeals had difficulty in defining hard core pornography absent the Miller guidelines. In *Village Books v. State's Attorney, supra,* it said, at 88:

"The precise meaning of 'hard core pornography' continues to elude us and other courts as well. Perhaps a completely satisfactory definition will never evolve."

It concluded, however, that the challenged material in that case, which it characterized as "garbage", was not hard core pornography.

**16.** In view of our decision, it has been unnecessary for us to view the subject films.

proceedings not inconsistent with the First Amendment standards established by *Miller* and its siblings as construed herein.

> *Order of the Circuit Court of Baltimore City vacated: case remanded for further proceedings consistent with this opinion; costs to be paid one half by appellant and one half by appellee; mandate to issue forthwith.*